WOODSIDE HOMES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. THE TOWN OF MORRISTOWN, NEW JERSEY, A MUNICIPAL CORPORATION, DEFENDANT-RESPONDENT.

Argued April 1, 1958—Decided April 28, 1958.

*Mr. Samuel A. Larner* argued the cause for the plaintiff-appellant (*Messrs. Budd, Larner & Kent,* attorneys).

*Mr. Fred G. Stickel, III,* argued the cause for the defendant-respondent (*Mr. E. Marco Stirone,* attorney).

The opinion of the court was delivered by

BURLING, J.   This is a suit to recover the cost of extensions of water mains.   The Superior Court, Law Division, heard the case without a jury and entered judgment dismissing the complaint.   The cause was appealed to the Superior Court, Appellate Division and, prior to hearing there, this court certified it on its own motion.

Respondent, the Town of Morristown, owns and operates a water system which supplies water to the inhabitants of six municipalities, in addition to Morristown.   One of the municipalities serviced is Morris Township.   Prior to 1931 Morris Township was served by the Normandy Water Company which had the exclusive franchise to supply water for the township.   In July of 1931 Morristown acquired by purchase the plant, net work and franchise of the Normandy Water Company and has since furnished water to the inhabitants of Morris Township.

The appellant is a real estate development company.   In 1954 appellant planned to construct a development of one-family homes in Morris Township.   The plan was for the construction of two sections.   In August of 1954 the appellant applied to the superintendent of the Water Department of Morristown for water service for section 1 of its development.   Water was necessary in order to construct homes, as well as to make them saleable after construction.   In order to furnish the development with water, it was necessary to extend an existent main and to construct new mains in the interior streets of the project.

In response to appellant's request to extend the mains at the cost of Morristown, the superintendent informed the appellant that the municipality would undertake to furnish water under two plans, both of which required the cost of

extensions to be absorbed by the appellant. Appellant was advised that Morristown would perform the necessary work at the appellant's expense, or that appellant might perform the work under Morristown's supervision. Appellant promptly entered into an agreement with Morristown, dated August 9, 1954. The agreement was Morristown's standard form whereby the town was to perform the necessary work in extending the mains, appellant agreeing to bear the entire cost of the work estimated to be $7,311.49. In addition the appellant agreed to provide all necessary excavating, backfilling and pavement repair and to pay the cost of all road opening permits. Appellant agreed to pay any difference should the actual cost of construction exceed the estimate and provision was made for a rebate in the event that the cost was less than the estimate. In fact, the cost of extension was over-estimated, and the town tendered and the appellant accepted a rebate of $334.02. The agreement further provided that after installation the mains were to be the property of Morristown. No formal protest concerning the validity of the agreement was ever entered by the appellant. During the construction of the homes the president of appellant, since deceased, told the superintendent "I'll take you into court some day."

Upon completion of the first section of the development the appellant again entered into a standard form of agreement with Morristown for the extension of water mains into the second section. Under this agreement, dated March 14, 1955, appellant performed the necessary work under the town's supervision. Morristown's uniform policy respecting rebates to developers was changed on January 1, 1955, and pursuant thereto the following provision for refunds was included in the agreement:

"As permanent taps are made in the main so laid, the cost of which are not a part of, nor included under this agreement, there shall be returned to the party of the second part the amount of Forty five Dollars ($45.00) for each service after the first full year's meter reading on each service, provided, that no return shall be paid on account of any tap made on the water mains included in this con-

tract after the expiration of five years from the date of the installation of the main, it being understood that only one refund will be made on each service installation."

There were 28 service connections or taps to the main made in section 2. In December 1956 (the present suit was instituted in March 1956), after a year had expired from the date of the last of the 28 taps, Morristown tendered a check for $1,260 representing the agreed rebate of $45 for each tap made. Appellant rejected the tender.

There are a total of 58 consumers of water who have connected with the extensions of the mains in both sections of the development. The cost of the extensions of the water mains was passed on by the appellant to the purchasers of homes via the sales price, and at oral argument the appellant stated that it had no intention in the event of its success to refund to the purchasers.

The record indicates that Morristown has since 1931 pursued three different policies with respect to the imposition of costs upon applicants for the extension of water mains. From 1931 until March 31, 1952 it was the general practice to impose the full cost of extensions upon developers with refunds calculated on the following alternative bases, i. e., (1) $3\frac{1}{2}$ times the charge for the first year's consumption made from all individual taps into the mains during a ten-year period, or (2) 75% of all charges made for consumption from each tap made during a 15-year period (later changed to a ten-year period).

Apparently the refund based upon $3\frac{1}{2}$ times the first year's consumption for each tap made within a period of ten years was derived from general regulations recommending a course of practice for charges made by utilities for extension of services promulgated by the Board of Public Utility Commissioners in 1923 by virtue of their authority under R. S. 48:2–25(a) and R. S. 48:2–27. It is noteworthy that the practice suggested by the Board of Public Utility Commissioners was to impose the entire cost of extension of mains upon the developer in the first instance, with provision for rebates as connections were made into the mains.

The two agreements entered into in the present case reflect Morristown's practice from 1952 to date. From April 1, 1952 through 1954 (the period covered by the first agreement), Morristown charged the entire cost of mains to developers without any provision for refund. From January 2, and apparently to date, Morristown's practice was to refund $45 for each tap made to the main, after the first full year's meter reading, within five years from the date of installation of any such tap. Agreements in accordance with the foregoing practices were required from virtually all developers, whether the particular development was within Morristown's borders, or outside of its borders in the areas serviced by the town. There were isolated instances in which Morristown, under special circumstances, would bear part of the initial cost, but these are not sufficient to detract from the generally uniform course pursued. The record indicates that no such special arrangements were made after 1952.

With respect to individual homeowners, a more flexible course was pursued, Morristown sometimes bearing the entire cost for extensions.

The present suit was instituted in March 1956. Appellant's complaint sets forth two theories. First, a cause of action sounding in tort for violation of an alleged public duty on the part of Morristown to extend mains into appellant's development at the town's expense, and secondly, an action in *quasi*-contract based upon the unjust enrichment of Morristown in that it acquired valuable property rights at appellant's expense. The amount of damages was stipulated and is based on alternative methods of valuation. First, appellant seeks a return of the monies expended in the extension of the mains. On this basis the amount of damages would be $8,426.09 for the extensions in section 1 and $5,771 for section 2. In the alternative appellant seeks damages in the amount of $7,843.43, which is computed on the basis of the Board of Public Utility Commissioners' suggested formula for refunds, *i. e.*, $3\frac{1}{2}$ times the first

year's charges for consumption for each tap for a period of ten years.

The trial court denied recovery on the ground that the agreements made between the parties were voluntary and binding on the parties.

Initially we note that a common law action for damages against a utility based upon a breach of a public duty, such as a refusal to furnish water service, is cognizable by the courts. See *Annotation* 108 *A. L. R.* 1174 (1937); 43 *Am. Jur., Public Utilities and Services, sec.* 31, *p.* 592. But in order to sustain its theory the appellant is obligated to show that the terms of the agreement requiring it to pay the cost for extension of the mains were either in violation of an absolute duty imposed by law upon Morristown to bear the cost of service extensions itself or that, under the circumstances of the case, Morristown abused its discretion in that regard.

The first issue raised by the parties is whether the Town of Morristown, in operating a water company originally acquired from a private source and servicing, under an exclusive franchise, the Township of Morris, is subjected to the jurisdiction of the Board of Public Utility Commissioners in respect to the extension of water mains. The appellant asserts that the recent case of *In re Borough of Glen Rock,* 25 *N. J.* 241 (1957), is authority for the proposition that municipally owned and operated water companies supplying water to areas without the municipal borders are not within the jurisdiction of the Board of Public Utility Commissioners. The proposition urged is too broad. In the *Glen Rock* case, *supra,* we held that municipally-owned water companies servicing areas outside of their territorial limits were not subject to the *rate-making* jurisdiction of the Board of Public Utility Commissioners. Mr. Justice Wachenfeld there held:

"The record indisputably discloses that over a period of 46 years the Board has consistently declined to regulate water rates charged by a municipality, and its administrative interpretation is entitled to great weight if there be any ambiguity in the statute under which

it operates  *  *  *  One hundred and twenty-three municipalities throughout the State operate their own water supply systems and have never been subjected to administrative regulation. Rate-making is a prodigious task, and we are unwilling to impose this enormous burden upon the Board without an unequivocal declaration by the Legislature expressly so stating."

Jurisdiction over *extensions* of water mains is another problem. *R. S.* 40:62–49(*d*) supplies the basic statutory authority for the acquisition of private water companies by a municipal corporation. When the Town of Morristown acquired the Normandy Water Company it did so by virtue of this section. *R. S.* 40:62–49(*f*) then provides:

"The municipality acquiring property as provided in paragraph 'd' of this section shall furnish and supply water to the adjoining municipality in which the connected distribution system is located and to any other municipality served from the same source or sources of supply when acquired, to the extent, for such length of time and under such terms and conditions as may be ordered by the board of public utility commissioners."

In *In re Borough of Glen Rock, supra,* the court declined to rule on the applicability of *R. S.* 40:62–49(*f*) to the dispute in that case, holding:

"There is no need, however, to attempt to divine the precise meaning of *R. S.* 40:62–49(*f*), since it is clearly inapplicable on the facts before us. This statute was enacted in 1929, eight years after Ridgewood had purchased the Bergen Aqueduct Company and had begun to supply the residents of Glen Rock with water. Ordinarily, it is presumed that a statute operates prospectively and not retroactively unless the Legislature otherwise specifies." (25 *N. J.* at *pages* 248–249)

Suffice it to say that if the language requiring municipalities to furnish water to other municipalities serviced by its system "to the extent  *  *  *  and under such terms and conditions as may be ordered by the Board of Public Utility Commissioners," has any meaning, it clearly applies to orders relating to extension of service. And since the Town of Morristown acquired the Normandy Water Company in 1931, two years after the passage of *R. S.* 40:62–49(*f*), no problem concerning retroactive application of the statute is raised.

■ It is our conclusion that Morristown, in acquiring the Normandy Water Company, and thereby the exclusive franchise to service the Township of Morris with water, is brought within the jurisdiction of the Board of Public Utility Commissioners insofar as orders compelling it to extend its service are concerned. *Cf. Mongiello v. Borough of Hightstown*, 17 *N. J.* 611, at *page* 619 (1955). This conclusion obviates the necessity for resolving the appellant's assertion that the confines of *R. S.* 40:62–47 *et seq.*, and interpretations thereof in the cases of *Reid Development Corp. v. Parsippany-Troy Hills Tp.*, 10 *N. J.* 229 (1952), *Reid Development Corp. v. Parsippany-Troy Hills Tp.*, 31 *N. J. Super.* 459 (*App. Div.* 1954), do not grant the basic statutory power to impose the cost of extensions upon the consumers. Absent an order of the Board of Public Utility Commissioners grounded upon the criteria furnished in *Title* 48 of the *Revised Statutes* there exists no absolute duty on the part of Morristown to refrain from charging consumers for the cost of extensions of service.

■ Appellant further contends that, conceding the fact that there is no absolute duty upon which a right to damages for breach may be maintained, nonetheless Morristown's denial of free service was an abuse of discretion. It asserts: "Significantly, in the case at bar, there was never asserted any contention by the defendant, either at the time of the applications or during the litigation that there existed any facts which could form a basis for a discretionary denial of water main extensions." The short answer to this assertion is that the Board of Public Utility Commissioners and not the judiciary is charged with the duty of determining in the first instance when a particular extension will be ordered. The standard to be employed is furnished by statute. *R. S.* 48:2–27 provides:

"The board may, after hearing, upon notice, by order in writing, require any public utility to establish, construct, maintain and operate any reasonable extension of its existing facilities where, in the judgment of the board, the extension is reasonable and practicable and will furnish sufficient business to justify the construction and

maintenance of the same and when the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension."

Thus, the question of reasonableness of a given extension and the terms and conditions upon which a utility will be ordered to provide services are vested in the sound discretion of the Board. And when, as here, a particular common law action requires a finding of abuse of discretion, committed by statute to administrative determination, in order to sustain a judgment for one of the parties, relief will be denied. This doctrine is alternately known as the doctrine of "primary jurisdiction" or "prior resort." See e. g., Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 S. Ct. 350, 51 L. Ed. 553 (1907); Great Northern R. Co. v. Merchants' Elevator Co., 259 U. S. 285, 42 S. Ct. 477, 66 L. Ed. 943 (1922); United States v. Western Pac. R. Co., 352 U. S. 59, 77 S. Ct. 161, 1 L. Ed. 2d 126 (1956); Davis, Administrative Law, § 197, pp. 664 et seq.; Annotations 94 L. Ed. 806, 1 L. Ed. 2d 1596. The initial expression of the doctrine in this country stems from the Abilene case, supra. The oil company brought a common law suit against the railroad to recover the excess over what was alleged to be unreasonable rates which had been charged them. The court held:

"a shipper seeking reparation predicated upon the unreasonableness of the established rate must * * * primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable * * *." (204 U. S. at page 448, 27 S. Ct. at page 358)

Uniformity of result and expertise in technical matters are the sound reasons for the doctrine. As stated by Mr. Justice Brandeis in the Great Northern R. Co. case, supra:

"Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being

exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the * * * controverted question and the nature of the enquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters, and uniformity can be secured only if its determination is left to the Commission." (259 *U. S.* at *page* 291, 42 *S. Ct.* at *page* 479)

The principle of primary jurisdiction is applicable in instances of concurrent jurisdiction but is doctrinally related to the principle of exhaustion of administrative remedies. Mr. Justice Harlan described the kinship in the case of *United States v. Western Pac. R. Co., supra,* in this manner:

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." (352 *U. S.* at *pages* 63, 64, 77 *S. Ct.* at *page* 165)

In *Oliva v. City of Garfield,* 1 *N. J.* 184 (1948), this court held that the judiciary could not, in the first instance, act as an administrative agency and decide the reasonableness of a variance, because the local board of adjustment did not have a quorum of members. Mr. Justice Ackerson there held:

"In reaching the conclusion that plaintiff was not entitled to a variance, the court was exercising, as a matter of original jurisdiction, a function committed by the Zoning Act to the sound dis-

cretion and experienced judgment of the board of adjustment, controlled by law and reason, and supervised under stated conditions by the governing body of the municipality, *R. S.* 40:55-39(c) and (d), and we think that this was a function which the court could not properly assume." (1 *N. J. p.* 189)

The doctrine of exhaustion of administrative remedies has been invoked in favor of the Board of Public Utility Commissioners in the case of *Junction Water Co. v. Riddle,* 108 *N. J. Eq.* 523 (*Ch.* 1931). That suit was for an injunction to restrain the defendant from supplying water to certain homes owned by him on the ground, *inter alia,* that the defendant was a public utility operating without the consent or approval of the Board of Public Utility Commissioners. In denying the injunctive relief Vice-Chancellor Berry said:

"Assuming, however, that the defendant is a public utility and operating under municipal consent not approved by the board of public utility commissioners (An Act Concerning Public Utilities, *P. L.* 1911, *ch.* 195, *p.* 384, § 24; 2 *Cum. Supp. to Comp. St. p.* 2892 § *167-40), complaint should be addressed to that board, as it has 'general supervision and regulation of, jurisdiction and control over, all public utilities' * * *, with complete power to enforce its orders and decrees. * * *

The Legislature in setting up that board and investing it with its broad powers * * * undoubtedly intended that questions such as that here involved should first be considered and disposed of by that board; and, while the act does not and could not derogate from the constitutional authority of the courts * * *, resort to the courts should be had, by the board, in matters within its jurisdiction, only when necessity arises for enforcement of its orders or decrees, and, by others, only for review of such orders or decrees." (108 *N. J. Eq.* at *pages* 526, 527)

Compare *Ward v. Keenan,* 3 *N. J.* 298 (1949); *Nolan v. Fitzpatrick,* 9 *N. J.* 477 (1952); *Central R. Co. of N. J. v. Neeld,* 26 *N. J.* 172 (1958); *R. R.* 4:88-14.

■ Since both of appellant's theories of action necessitate a judicial determination of the reasonableness of the terms exacted for the extension, and since that matter is one which must, in the first instance, be determined by the Board of Public Utility Commissioners, the claims are not main-

tainable without a prior ruling from that agency on the question.

While, in an appropriate instance, the judicial action may be stayed, and the cause remanded to the administrative agency for a determination of whether an abuse of discretion existed, *Mitchell Coal & Coke Co. v. Pennsylvania R. Co.,* 230 *U. S.* 247, 33 *S. Ct.* 916, 57 *L. Ed.* 1472 (1913); *General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 *U. S.* 422, 60 *S. Ct.* 325, 84 *L. Ed.* 361 (1940); *Thompson v. Texas Mexican Ry. Co.,* 328 *U. S.* 134, 66 *S. Ct.* 937, 90 *L. Ed.* 1132 (1946); *United States v. Western Pac. R. Co., supra; Davis, supra, pp.* 672–673; *cf. City of Hoboken v. Jarka Corp.,* 26 *N. J.* 336 (1958), the interests of justice do not warrant such a procedure here.

It is our view that the appellant is estopped from presently asserting that Morristown abused its discretion and that therefore there is no need to remand the cause to the Board of Public Utility Commissioners. The appellant entered into a contractual arrangement with Morristown and it cannot deny the efficacy of its undertaking. Morristown, by virtue of *R. S.* 40:62–83, has been granted the authority to enter into contracts with consumers within and without the municipality for the "sale and delivery of a supply of water." *Cf. R. S.* 48:19–19. The only proscription is that of equality of treatment for those residing outside the municipal borders. Thus *R. S.* 40:62–85 provides:

"The water shall be supplied to such dwellers and other consumers of water in other municipalities upon the same, or as favorable terms and conditions, as water shall be furnished to dwellers within such municipality for the supplying of which with water such waterworks have or shall have been organized or established."

Morristown has not discriminated between developers within and without the municipality. The agreements have, for the period in which the particular policy has been in force, been uniformly required of all developers wherever situated.

Nor is inequality demonstrated by the differentiation of treatment between individuals and developers. Developers may, and have been treated as a separate class. See General Rules for Extension of Service promulgated in 1923 by the Board of Public Utility Commissioners. The reason for such differentiation has been suggested by the court in the *Reid* case, *supra* (31 *N. J. Super.* at *page* 464) :

"Furthermore there is questionable proof of immediate need; there are no consumers in the area for which plaintiff seeks main extensions and no assurance of a likely customer return in the reasonably proximate future. The effect of plaintiff's request is to ask the municipality to take a stake in the speculation of its success in the prospective development of the area, without assurances as to the amount of return it will receive for its investment or when it will be realized, if ever. We do not find that the municipality's disinclination so to do was an arbitrary, unreasonable or abusive exercise of discretion. As Mr. Justice Heher stated : '* * * a municipality so engaged exercises a governmental discretion as to the extension of the water mains, governed largely by the extent of the need and economic considerations * * *.' *Reid Development Corp. v. Parsippany-Troy Hills Tp.*, *supra*."

Appellant asserts that the contract is not a bar to recovery because it was not voluntarily entered into; that its assent was coerced by economic compulsion or duress. There is little merit to this argument. Before the doctrine of business compulsion can be invoked there must be an assent by one party to an improper or wrongful demand by another under circumstances in which the former has little choice but to accede to the demand, *i. e.,* "to do what he otherwise would not have done." *S. P. Dunham & Co. v. Kudra*, 44 *N. J. Super.* 565 (*App. Div.* 1957) ; and see *Rubenstein v. Rubenstein*, 20 *N. J.* 359, 366 (1956) ; *Dalzell, "Duress by Economic Pressure,"* 20 *No. Car. L. Rev.* 237 (1942) ; *Dawson, "Economic Duress—An Essay in Perspective,"* 45 *Mich. L. Rev.* 253 (1947). It is essential before duress is found that the complainant be compelled to accede by wrongful pressures. *Williston, Contracts* (*rev. ed.* 1937), § 1606.

██ We have previously alluded to the fact that the demand on the part of Morristown cannot, in the absence of an order compelling it to extend its water mains at its own cost, be considered wrongful.

Further, appellant had knowledge through previous projects of the practice of Morristown to charge developers for the extensions of mains. No formal protest was ever registered, save for the enigmatic statement of appellant's president to the superintendent that "I'll take you into court someday."

After the work on section 1 was completed appellant accepted the tendered difference between the cost and the estimate without protest. See *Williston, supra,* § 1623. And a year later, after the work on section 1 was completed the appellant again entered into a voluntary agreement for extension of mains in section 2, again without protest. It was not until two years following the original agreement, after all the work had been completed and the homes sold, that the appellant commenced the instant suit.

We are satisfied from a study of the record that the appellant voluntarily entered into the contracts without duress or compulsion. Appellant is estopped at this late date from contending that Morristown abused its discretion in requiring the extension of the water mains at appellant's own cost.

██ Appellant's final argument is that it is entitled to relief by way of compulsory condemnation. This argument is without merit since there has been no "unlawful taking." *Cf. Haven Homes, Inc., v. Raritan Tp.,* 19 *N. J.* 239, 247 (1955).

The judgment appealed from is affirmed.

HEHER, J., concurring in result.

*For affirmance*—Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For reversal*—None.