70 N.J. Super. 529 (1961)
176 A.2d 34
THE CITY OF SUMMIT, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
HORTON CORPORATION, A CORPORATION ETC., CONTINENTAL CASUALTY COMPANY, A CORPORATION ETC., AND TOWNVIEW MANOR A, A CORPORATION ETC., ET AL., DEFENDANTS, AND
CONTINENTAL CASUALTY COMPANY, A CORPORATION ETC., THIRD-PARTY PLAINTIFF,
v.
CHARLES BORINSKY, ET AL., THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided November 14, 1961.
*530 Mr. Peter C. Triolo, attorney for plaintiff.
Mr. Julius Stein for defendants Horton Corporation and Townview Manor A, and for third-party defendants (Messrs. Stein and Feinseth, attorneys).
Mr. Louis Auerbacher, Jr., attorney for Continental Casualty Company, defendant and third-party plaintiff.
MINTZ, J.S.C.
This is a suit by a municipality against a land developer and its surety. The plaintiff, City of Summit, seeks to compel the developer, defendant Horton Corporation (hereinafter referred to as "Horton"), to build an adequate storm sewer system in the area developed by it known as "Prospect Park" in Summit. It asserts that defendant Horton and its surety, Continental Casualty Company (hereinafter referred to as "Continental"), agreed with plaintiff to construct an adequate storm sewer system in the development in accordance with the municipal requirements; that defendant Horton failed to construct same; that defendants should be required to specifically perform said agreement, and failing same that they be *531 required to answer in damages. Additionally, plaintiff seeks to enjoin defendant, Townview Manor A, a subsidiary corporation of Horton, from selling a house in "Prospect Park" known as 10 Glen Avenue. The charge is that the dwelling is constructed below the level of the storm sewer constructed by the defendant Horton, and as such is subject to constant flooding, presents a public hazard, and is a menace to innocent purchasers for value.
Defendant Horton contends that the storm sewer system installed by it complies with all municipal requirements and particularly with the plat and improvement plans submitted in connection with preliminary and final approval, and that it was required under economic duress to make installations not called for under its agreement with the municipality. Horton further contends that if any flooding exists in the dwellings or upon the subject lands, it is due to the installation of an additional drainage pipe from Hand's Pond to Stockton Road which the municipality insisted upon as a prerequisite to the issuance of certificates of occupancy for various dwellings completed by Horton; that it was under no obligation to provide drainage for Hand's Pond, which is adjacent to but does not form a part of the tract developed by Horton. Horton counterclaims for a judgment directing the city to accept the improvements made by it and to cancel the surety bond and further seeks damages from the city upon the allegation of malicious refusal to accept the improvements.
Defendant Townview Manor A (hereinafter referred to as "Townview") contends that the certificate of occupancy for 10 Glen Avenue was issued and subsequently unjustifiably revoked by the building inspector and by reason of such revocation it has suffered damages for which it seeks a recovery.
Defendant Continental in effect asserts the same factual contentions as those made by Horton. Additionally, it urges a release from liability because of a material change in the improvement plans made by the municipality after the posting *532 of its bond and particularly asserts that the bond did not call for the installation of a storm sewer line from Hand's Pond to Stockton Road and did not guarantee that Horton provide an outlying ditch across lands of Commonwealth Water Company (hereinafter referred to as "Commonwealth"), an adjoining landowner. Continental cross-claims against Horton for indemnification and has filed a third-party complaint against individual indemnitors on the bond.
In 1957 Horton was the owner of 25 acres of undeveloped lands in Summit fronting on Baltusrol Road and which it proposed to subdivide and develop. Adjoining the Horton tract to the northeast is Hand's Pond, a low area which for more than 50 years served as a natural drainage basin for approximately 40 to 50 acres, including about 7 1/2 acres of Horton's lands.
Prior to the filing of an application for tentative approval of a proposed subdivision for this tract, Benjamin Shalit, secretary of Horton and the officer who conducted all negotiations in behalf of said corporation, called upon Mr. J. Henry Negus, city engineer and acting secretary of the planning board, to discuss general procedures and proposed improvements to be installed by the developer in its development. Mr. Negus apprised Mr. Shalit of the drainage problem with respect to Hand's Pond. Mr. Shalit indicated his familiarity with the problem and his willingness to cooperate in solving it. About six weeks later Mr. Shalit again visited Mr. Negus with his engineer, Mr. Fuhrmann of the firm of Grassmann & Kreh, and again the development as a whole was discussed. Thereafter a topographical survey dated December 1956, was submitted by Horton's engineers to Mr. Negus. This survey showed a "proposed storm sewer" extending from Hand's Pond in a westerly direction across Horton's lands to a "proposed ditch" on lands of Commonwealth and thence projected in a southwesterly direction a considerable distance to an existing brook on the Commonwealth lands.
*533 On May 23, 1957 Horton filed application with the city planning board for tentative approval of the plat plan. The application recites that in connection with same the developer submitted copies of preliminary layout, plans and profiles for street grading, sanitary and storm sewers, and topographical maps. In none of these documents was there any provision for the installation of a storm sewer (which was subsequently installed as hereinafter related) from Hand's Pond across the rear of lots numbers 26, 25, 22 and thence along the northerly side line of lot 22, adjoining lot 23, in Block B to Stockton Road. This section of the installation was interchangeably referred to as the storm sewer line running from Hand's Pond to Stockton Road. The improvement plans showed three storm sewer outlets on the westerly boundary line of the development, one leading to lands of the Union County Park Commission and two to lands of Commonwealth.
Horton's application for tentative approval was considered at a public hearing before the planning board on July 25, 1957, at which time Commonwealth objected to the proposed discharge of water from Hand's Pond onto its lands. On August 26, 1957 Mr. Negus, as acting secretary of the planning board, wrote Mr. Shalit that the board deferred action until agreement was reached between the developer and Commonwealth. Thereafter Horton agreed to revise its plans so as to provide for only one outlet onto the lands of Commonwealth which would serve as a drainage for a small portion of Stockton Road and from lots 30 and 31 in Block D on the westerly side of Stockton Road.
On October 24, 1957 Mr. J.F. Heyworth, assistant manager of Commonwealth, wrote to the chairman of the planning board stating that they withdrew all objections to the proposed subdivision in view of Horton's agreement, and further stated that:
"The proposed storm sewer easement as shown on the subdivision map is not to be used at this time and if used in the future, it will be necessary to obtain the approval of the Commonwealth Water *534 Company before emptying the additional drainage water onto our property."
The proposed subdivision was further considered by the planning board at its meeting on November 14, 1957. The minutes of that meeting state that:
"The city engineer stated that Mr. Shalit in providing only two outlets for the storm water had complied with all the requirements required of him by the Commonwealth Water Company's letter to the Board, and Mr. Shalit had provided provisions for a right of way and deep catch basins as required by the city. It was the city engineer's opinion that the reservation contained in the letter should be the problem of the other property owner when and if he attempted to develop the land now covered by the pond."
Subsequently the planning board disapproved the proposed subdivision (which was approved by Mr. Negus as complying with municipal requirements) on the sole ground that the proposed relocation of the U.S. Highway Route 22 would cut through the property. The city common council on December 17, 1957 affirmed the action of the planning board. Thereupon Horton filed a complaint in lieu of prerogative writ. On March 4, 1958 summary judgment was entered in that proceeding, directing the municipality to grant approval of the preliminary plat of major subdivision in accordance with applicable statutory provisions and municipal ordinances. The judgment further reserved to the city the right to defer compliance until July 21, 1958, and in the interim to move to vacate said judgment if construction plans for U.S. Highway 22 were formalized and published.
On September 11, 1958 the planning board recommended for approval a preliminary plat of "Prospect Park," dated September 2, 1958 submitted by Horton and prepared by its engineers Grassmann & Kreh. The city council approved this preliminary plat on September 16, 1958.
On October 2, 1958 Horton submitted to Mr. Negus an estimated cost of improvements to be installed by the developer in Prospect Park in the sum of $124,053.50. The *535 amount of the bond was fixed at $125,000 and furnished by the surety, Continental.
On December 5, 1958 Horton filed application for final approval of the plat plan. This application recites that in connection with same, plat plans and improvement plans are submitted. No topographical survey or map is referred to in said application. The application provides, inter alia, that the applicant will improve the streets and property shown on the application and the maps and plans accompanying the same or "such maps, plans and specifications as may be substituted therefor with the consent of both the applicant and the Planning Board"; that the applicant will comply with all municipal requirements set forth in the ordinances prescribed for the performance of work involved in the project and will comply with all requirements of the planning board governing the subdivision of land; that the performance of such work shall be under the supervision of an inspector of the municipality and the cost of such inspection shall be borne by the applicant.
At the January 22, 1959 meeting of the planning board, a letter was read from Mr. Negus advising the board that Horton had agreed to install a 30" storm sewer through an easement and that Mr. Negus had no further objections to the proposed development plan. Accordingly, the board approved the final improvement plans. On February 2, 1959 the city council approved the final plat.
In April 1959 and thereafter building permits were issued. Ultimately, 75 dwellings were constructed and certificates of occupancy issued for all of them. However the certificate of occupancy issued for 10 Glen Avenue on December 21, 1959 was subsequently revoked on August 9, 1960.
During the regular course of construction Horton installed a 36" storm sewer from Stockton Road along the side line of Lot 31 in Block D to lands of Commonwealth. However, the developer denies any agreement to install a storm sewer line from Stockton Road to Hand's Pond. On this issue there were inconsistencies between the testimony *536 of Mr. Negus at the trial and in his pretrial deposition. I am mindful of the fact that no specifications or profile was submitted at or before final approval showing any storm sewer installation in this section of the development, and that the estimated cost of improvements upon which the amount of the performance bond was calculated does not include the estimated cost of this section of the storm sewer line subsequently installed at the actual cost of $4,860. None of the plans submitted to the bonding company, and upon which it relied in issuing its performance bond, provided for the installation of this section of the storm sewer line. I find, however, that Exhibit P-4 constitutes a part of the final improvement plans agreed upon prior to final approval and before acceptance of the bond. On this exhibit, however, the 36" storm sewer line from Stockton Road to land of Commonwealth is designated "Proposed Storm Sewer," whereas the 30" line from Stockton Road to Hand's Pond is shown in a "Proposed Storm Sewer Easement." The minutes of the planning board meeting of January 22, 1959 are indicative of such an agreement. The testimony is contradictory and confusing. The probabilities are that Mr. Shalit, anxious for final approval, agreed to this installation perhaps in the expectation that the city would not ultimately insist upon a storm sewer line from Hand's Pond in the absence of an outlet.
It was not until all houses in the development were completed and the roads constructed that Mr. Negus first requested the actual installation of the extension of this line to Hand's Pond and that it be increased to 36" (the increase not being a material change in the plans). He arranged for the withholding of certificates of occupancy until Mr. Shalit agreed by letter dated December 14, 1959 to make such installation. Thereafter, the certificates of occupancy were issued and Horton proceeded with the work as agreed. Mr. Negus knew that the water was to be diverted into a pipe that had no outlet, and that Commonwealth *537 objected to the discharge of waters from Hand's Pond onto its property. Mr. Shalit acceded because he was anxious to procure certificates of occupancy and deliver possession to various purchasers. I conclude, however, that such installation was not made under economic duress. Cf. Woodside Homes, Inc. v. Morristown, 26 N.J. 529 (1958).
Subsequently, Mr. Shalit applied to Mr. Negus for cancellation of the bond posted by Continental. Mr. Negus, by letter dated June 24, 1960, replied that before he could recommend such release the developer would be required to perform items of work detailed in said letter, all of which work has since been admittedly accomplished. He also advised that Horton would be required to pay inspection costs according to article VII, section 2 of the subdivision ordinance. Horton concedes this indebtedness of 2% of the bond in the sum of $2,500, the amount claimed by the city. He further wrote that:
"In regard to the drainage problem, due to the refusal of the Water Company to allow the drainage ditch across their land the approved plan will not work and we will require that your engineers submit an alternate plan."
In 1960, during heavy rains, flood conditions prevailed on the Kleppe premises at 44 Stockton Road (Lot 30 Block D), and on the Heberling premises at 43 Stockton Road (Lot 22 Block B). Apparently a similar condition prevailed at 10 Glen Avenue. The flood conditions were primarily due to the failure to provide an outlet for the storm sewer from Hand's Pond. Plaintiff asserts that the developer stripped the topsoil and by changing the contour of the land increased the drainage into Hand's Pond. Additionally, plaintiff charges that the storm sewer line was improperly installed and certain yard drains improperly installed. With no outlet provided for the storm sewer, the water emanating from Hand's Pond backs up and flows out through the yard drains, flooding the area in question. The city urges that the system should be lowered to afford positive drainage from Hand's Pond. The developer counters with the assertion that its development *538 did not aggravate the situation at all  that at most 10 acres or so of its land is tributary to Hand's Pond, a drainage area for approximately 40 acres of land, and that the various catch basins and other improvements it installed more than absorb the additional drainage into Hand's Pond caused by its development. Further, Horton asserts that the storm sewer line was installed under the direction and supervision of Mr. Negus and over the objection of the developer, who cautioned Mr. Negus that draining the water from Hand's Pond into a storm sewer without an outlet would cause the very condition the municipality subsequently complained about. The system is designed to take the water from Hand's Pond only after it reaches a certain level. The invert of the pipe set by Mr. Negus does not afford complete drainage of the pond. Thus, the municipality recognized that the elimination of Hand's Pond was not defendant's responsibility. It cannot now complain of the installation made under the supervision and direction of the city engineer.
About August 1960 the city arranged a temporary expedient with Commonwealth, whereby Commonwealth permitted the city to dig a ditch from the rear of the Kleppe lot across the Commonwealth land for a distance of approximately 900 feet to a wet weather area, thereby providing an outlet for the storm sewer. As a result, conditions have improved materially.
The pivotal issue is whether or not Horton agreed to provide a drainage ditch across the lands of Commonwealth, or inferentially agreed to provide an alternate outlet for the storm sewer in question.
Obviously, specific performance of any alleged agreement, or in the alternative an injunction requiring the developer to install a drainage ditch or other outlet as recommended by plaintiff's expert witness, is not available to plaintiff. Horton did not reserve any right of way over the rear of the lots adjoining Commonwealth, and cannot appropriate any lands of Commonwealth. The city, under *539 its power of eminent domain (R.S. 40:60-2), can, if it deems it necessary, proceed to make the necessary improvement. Thus, the issue is simply whether the developer is accountable to the municipality for damages calculated upon the reasonable costs to be incurred by the city in completing the improvements.
Stress is placed upon the conferences between Mr. Shalit, Mr. Negus and Mr. Coleman of Commonwealth before and after final approval of the plat, wherein Mr. Shalit endeavored to procure drainage rights. Mr. Shalit's recognition of the Hand's Pond drainage problem, and his willingness to cooperate in solving it as part of an overall plan for the development of the municipality, are not to be equated with an obligation when viewed in the light of the attendant circumstances. Certainly, after Mr. Negus' letter of June 24, 1960 any participation by Shalit in conferences with Mr. Coleman for drainage rights was prompted by the knowledge that the bond would not be released unless an outlet was provided.
Plaintiff urges that the topographical survey dated December 1956 clearly shows the ditch and that this survey or map was a part of the preliminary plans approved. A topographical survey is not designed to show improvements. It merely shows the contour of the land and is helpful in the preparation of layouts for improvements. No specifications or details for the ditch are shown on this map. It is not referred to in the application for final approval of the plat, and apparently was submitted preliminarily to the submission of an application for tentative approval. The ditch is marked "Proposed ditch." I cannot conceive how this single document can under the stated circumstances impose on the developer the obligation to provide a drainage ditch. Additionally, it should be noted that the plaintiff introduced into evidence another topographical survey whereon the center line of the proposed ditch is crossed out and the initials "B.S." (Benjamin Shalit) appear alongside of the delineation. Mr. Shalit testified *540 that when he ascertained that ditch rights were not available, he crossed out the proposed ditch at the request and in the presence of Mr. Negus. The explanation is plausible.
It clearly appears that at the time of tentative and final approval the municipal authorities were fully aware that Commonwealth would not grant any drainage rights beyond those set forth in its letter of October 24, 1957 to the planning board. It recommended final approval to the common council on January 22, 1959 because Mr. Negus had no further objection to the plans. It is further noted that when Mr. Negus directed the withholding of the certificates of occupancy pending the installation of a storm sewer line from Hand's Pond, he did not even at that time ask for a commitment from the developer to acquire the drainage rights or to provide any alternate outlet. Yet the municipality now seeks to impose the obligation on the developer to secure drainage rights or provide an alternate outlet because the municipal representatives knew that Mr. Shalit and Mr. Fuhrmann were endeavoring to acquire same, and felt that they would be ultimately successful. Such expectation or "hope" cannot be converted into an obligation. If the municipality desired to impose the burden of eliminating Hand's Pond on the developer, it could have done so by refusing to approve the subdivision until Horton provided an outlet for the drainage from Hand's Pond. This it did not do. Horton has completed all the required improvements. It built and sold all the homes, except one. The municipality cannot, after final approval, impose this added major burden upon Horton. The determination of facilities to care for the problem of water drainage in a proposed subdivision should be made overall at the inception "on the application for tentative approval  for the proper protection of the public interest as well as to enable the developer to discern with particularity what he must do." Hilton Acres v. Klein, 35 N.J. 570 (1961); see also Levin v. Livingston Tp., 35 N.J. 500, at pp. 510-511 (1961).
*541 On Ascot Way flooding conditions prevailed which were not rectified by Horton until after this suit was instituted. There was an existing ditch from Ascot Way to lands of the Union County Park Commission. The storm sewer on Ascot Way emptied into this ditch. That water condition was corrected by Horton's widening of the ditch, but such action is not evidential of any obligation on Horton's part to provide an outlet for the Hand's Pond storm sewer.
I conclude that defendant Horton is not obligated to provide an outlet for the subject storm sewer line, and hence is likewise not accountable for any damages the city may incur in providing a permanent drainage outlet.
As already observed, Horton admits liability for the payment of the inspection and supervision fee in the sum of $2,500. Accordingly, plaintiff is entitled to judgment against Horton and Continental for $2,500. Judgment will be entered on the cross-claim of Continental against Horton for indemnification, and likewise in favor of Continental on its third-party complaint against the third-party defendants for indemnification. Judgment will be entered in favor of Horton on its counterclaim directing plaintiff to accept the improvements. Horton's counterclaim for damages against plaintiff is denied.
The certificate of occupancy for 10 Glen Avenue was unjustifiably revoked about seven months after issuance. The testimony does not support plaintiff's contention that the premises constitute a menace to the public health. Plaintiff is not entitled to injunctive relief against Townview Manor A.
The counterclaim for damages allegedly sustained by Townview Manor A by reason of the revocation of the certificate of occupancy was not urged at the trial, and is dismissed.
A form of judgment consistent with the views herein expressed will be submitted, consented to as to form or to be settled on notice.