261 N.J. Super. 468 (1992)
619 A.2d 262
NATIONAL AMUSEMENTS, INC., PLAINTIFF,
v.
NEW JERSEY TURNPIKE AUTHORITY AND HERBERT I. OLARSCH, DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided June 26, 1992.
*470 Morris M. Schnitzer, for plaintiff.
Martin J. Milita, Sills, Cummis, Zuckerman, Radin Tischman, Epstein & Gross, Attorneys), for defendants.
WEISS, J.S.C.
Plaintiff filed its second amended complaint on December 17, 1990. The complaint contains four counts; Count One seeks damages from defendant New Jersey Turnpike Authority ("Turnpike Authority") for inverse condemnation; Counts Two, Three and Four seek damages from both the Turnpike Authority and Defendant Herbert Olarsch ("Olarsch"). Count Two alleges tortious interference with an economic advantage; Count Three alleges unjust enrichment and Count Four alleges economic duress. Defendants have moved to dismiss Counts Two, Three and Four pursuant to R. 4:6-2(e) for failure to state a claim upon which relief can be granted.
Both parties have submitted to the court documents not contained in the pleadings. Since the court's decision relies on *471 facts beyond those contained in the pleadings, defendants' motion to dismiss is converted into a motion for summary judgment. R. 4:6-2.
The following facts are undisputed. Plaintiff owns an 18.74 acre tract of land in Newark, New Jersey ("Theater Property"). The land is bounded by Foundry Street, the New Jersey Turnpike and State Highway Routes 1 and 9. Plaintiff operated a drive-in movie theater on the property from approximately 1954 to 1985. Sometime in 1984, Plaintiff began plans to develop this property as a state-of-the-art, 12 screen movie theater complex. On February 4, 1985 it obtained site plan approval and on March 6, 1985 a building permit was issued by the City of Newark. Plaintiff proceeded to demolish the existing structures and to grade the property in preparation for construction.
In or about June 1985, the Turnpike Authority announced a proposal to widen various sections of the New Jersey Turnpike. By letter dated July 5, 1985, the Turnpike Authority notified plaintiff that its proposed project would require the purchase of a portion of plaintiff's property. By letter dated August 22, 1985, the Turnpike Authority informed plaintiff that its preliminary engineering designs for the proposed project were not yet complete and advised plaintiff not to proceed with the development of its property until a final right of way line was established.
As you and your organization are aware, due to the fact that National Amusements, Inc. was about to construct its project on the subject parcel, the Turnpike Authority felt it necessary to forward your organization a notice of taking as soon as possible. As the preliminary engineering design for the entire area is not as yet completed, there is a possibility that the right-of-way line, as forwarded to you, may be modified. Therefore, National Amusements, Inc. is advised, not to proceed with any further development of the remaining portion of the property until a final, fixed property right-of-way line is established for the subject acquisition by the New Jersey Turnpike Authority.
On September 16, 1985 plaintiff responded to the Turnpike's letter, setting forth its version of prior meetings held with Turnpike personnel and the supposed cooperative progress that the two groups were making. The letter then stated:

*472 Until the Turnpike Authority commits itself, officially and legally, to a definite and binding course of action with respect to our property, there is no assurance that the Authority will take any part of our Theatre property. Under these circumstances, we are entitled, as property owners, to proceed with the full construction of a Multiplex Theater, as nearly on schedule as possible, and we intend to do so.
In a letter dated September 23, 1985, the Turnpike Authority further advised plaintiff that the commencement of any construction by plaintiff would be done at plaintiff's risk.
To commence your construction operations after we specifically advised you of our intention can only be interpreted as a bad faith attempt to inflate the valuation of the property. This courtesy was extended to you as it was our intention for you to avoid the expenditure of funds for the short period between the date of my letter and finalization of the Turnpike Authority's plans. Should you still continue to commence construction of your project, you do so at your own peril. (Emphasis added)
In a letter dated October 4, 1985, plaintiff advised the defendants that plaintiff intended to commence construction of a theater complex on the portion of plaintiff's property excluded from the proposed taking. By letter dated October 18, 1985 the defendants again advised plaintiff that commencement of the construction would be at plaintiff's "own risk." Plaintiff built a 10 screen movie theater complex on the property, rather than the proposed 12 screen theater complex.
Upon completion of its engineering designs, the Turnpike Authority concluded that the proposed project would not require the condemnation of any portion of plaintiff's property. The Turnpike Authority communicated this decision to plaintiff on or about March 14, 1990.
The communications between plaintiff and the Turnpike Authority regarding the proposed project and the subsequent decision not to condemn a portion of plaintiff's property were executed by defendant Olarsch in his capacity as Counsel for the Turnpike Authority.
The following are the sole issues to be decided by this motion for summary judgment:
*473 1. As a matter of law, do Counts Two, Three and Four of plaintiff's second amended complaint state a claim upon which relief may be granted?
2. Does the N.J. Tort Claims Act, N.J.S.A. 59:1-1 immunize each of the defendants from liability for the tort claims alleged in Counts Two, Three and Four of plaintiff's second amended complaint?

A. TORTIOUS INTERFERENCE WITH AN ECONOMIC ADVANTAGE
Count Two of plaintiff's second amended complaint seeks damages for defendants' alleged tortious interference with plaintiff's economic advantage. According to plaintiff, the defendants were officially notified of plaintiff's construction plans on several occasions during the construction approval process, however the defendants never objected to the construction, nor did they warn the plaintiff that the project to widen the New Jersey Turnpike was under study and consideration.
It is undisputed that the defendants officially notified the plaintiff of the proposed widening project and possible taking of a portion of plaintiff's property on July 5, 1985. This was several months after plaintiff's plans to build a 12 screen movie theater complex were finalized and publicly announced, and after the drive-in movie theater on the property was demolished in preparation for the new construction. Prior to the July 5, 1985 notification of taking by defendant, the parties had numerous meetings in which there were discussions concerning the Turnpike's plans vis a vis plaintiff's property. The defendants notified plaintiff of their decision not to take any portion of plaintiff's property on March 14, 1990, almost five years after defendants initially notified plaintiff of the proposed taking. Although plaintiff did build a 10 screen movie theater complex on the property, plaintiff contends that the defendants tortiously interfered with plaintiff's construction. Said interference allegedly caused plaintiff to lose the economic benefits associated *474 with the ownership and operation of a 12 screen movie theater complex during the nearly five year period that the defendants contemplated the taking.
Plaintiff, in support of its allegation of an interference with "economic advantage," cites Printing Mart v. Sharp Electronics, 116 N.J. 739, 563 A.2d 31 (1989). In Printing Mart the Court set forth the elements of the cause of action. First, the complaint must demonstrate that the plaintiff was in "pursuit" of business. Second, the complaint must allege facts claiming that the interference was done intentionally and with malice. For the purposes of this element of the cause of action "malice is defined to mean that the harm was inflicted intentionally and without justification or excuse". id. at 751, 563 A.2d 31. Third, the complaint must allege facts leading to the conclusion that the interference caused the loss of the perspective gain; and fourth, the complaint must allege that the injury caused damage. id. at 751, 563 A.2d 31.
In the context of the present motion the court's inquiry is directed to the second element of the cause of action, i.e., that the acts of the defendants which interfered with plaintiff's economic advantage were done intentionally and with malice. Viewing the facts most favorably to the plaintiff, as the court must do in a motion for summary judgment, and giving the plaintiff the benefit of all doubts, the critical issue is whether the Turnpike's letter of August 22, 1985 sent by Olarsch to plaintiff was done with the necessary "malice" required to sustain an action for intentional interference with the perspective economic relation. It is the defendants' behavior in the context of the facts of the case which is critical. Did the defendants act intentionally and wrongfully without justification?
There is no question that the defendants' acted intentionally. The letter of August 22 was sent by Olarsch on behalf of the Turnpike to plaintiff. Was this a wrongful act without justification or excuse?

*475 ... The essence of the cases in this field is that in adjudging whether what the defendant has done is actionable, i.e., not done in the exercise of an equal or a superior right, the ultimate inquiry is whether the conduct was "both injurious and transgressive of generally accepted standards of common morality or of the law." ... In other words, was the interference by defendant "sanctioned by `rules of the game'." ... There can be no higher test of liability in this area than that of the common conception of what is right and just dealing under the circumstances. Not only must defendant'[s] motive and purpose be proper but also must be the means. Sustick v. Slatina, 48 N.J. Super. 134, 144, 137 A.2d 54 (App.Div. 1957)
The undisputed facts in this case are that the Turnpike in early 1985 announced plans for proposed widening of its highway. Thereafter, there were series of meetings between Turnpike and plaintiff's representatives, something which is not uncommon in situations such as this. These meetings were followed by a series of letters between the parties. It is the letter of August 22 written by Olarsch on behalf of the Turnpike to plaintiff which is the nub of plaintiff's complaint in this matter.
In its August 22 letter to plaintiff, after pointing out that the Turnpike's design was merely preliminary and might be modified in the future, it advised plaintiff not to proceed with further development of his property until final plans for fixing the right of way were established. The letter is written in terms of a suggestion, i.e., "advised". In plaintiff's September 16 reply to that letter it rejected this "advice" because of the lack of guarantee that the Turnpike would take any part of plaintiff's property and stated that it intended "to proceed with the full construction of a Multiplex Theater as nearly on schedule as possible." It was to this letter that the Turnpike responded that it could only interpret plaintiff's actions "as a bad faith attempt to inflate the valuation of the property". The letter concluded by stating "should you still continue to commence construction of your project, you do so at your own peril." In its subsequent letter of October 18 the Turnpike stressed that their plans were only preliminary plans and that if *476 plaintiff proceeded with construction of the theater project "you do so at your own risk".
The ultimate inquiry is whether the [defendant's] conduct was "both injurious and transgressive of generally accepted standards of common morality or of law." In other words, was the interference by defendant[s] "sanctioned by the rules of the game."
Printing Mart, 116 N.J. 739, 757, 563 A.2d 31 quoting Sustick v. Slatina, 48 N.J. Super. 134, 144, 137 A.2d 54 (App.Div. 1957); see also Baldasarre v. Butler, 254 N.J. Super. 502, 526, 604 A.2d 112 (App.Div. 1992)
This is a case of eminent domain. Defendants' verbal and written communications with plaintiff merely set forth the Turnpike's position with respect to the proposed taking of plaintiff's property and the corresponding issue of compensation. Plaintiff was not legally bound by the defendants' communications and was free to proceed with construction as plaintiff deemed appropriate. Plaintiff has pointed to no facts which inhibited it from carrying if ever out its construction plans.
To accept plaintiff's argument that the letter of August 25, 1985 from the Turnpike transgressed generally accepted standards of "socially acceptable conduct" would mean that every time a lawyer sets forth his client's position in a transaction and tells the other party that acting contrary to the lawyer's client's position would be considered an act of "bad faith", and there is modification of plans by the other party a cause of action for tortious interference would arise. Plaintiff has cited the court to no case which supports such a theory. The "rules of the game" sanctioned defendants' conduct. Defendants' had a perfect right to set forth their position in responses to plaintiff's position as contained in the letter of September 16, 1985, just as plaintiff had a perfect right to proceed with its construction plans. Each side understood the risk it ran by continuing in their respective courses of conduct. Each was free to make its own business and legal judgment as to the validity of its position in the matter. Plaintiff was under no legal compulsion *477 to reduce its plans for 12 theaters to 10 theaters. This was a decision it made and plaintiff may not now complain that the Turnpike must compensate it for its own decision on the facts in this case.
At oral argument plaintiff attempted to justify its scaling down of its project on the grounds of "proportionality." If only $500,000.00 were at stake then plaintiff might have made a different decision and proceeded with its 12 screen theater. However, because a much larger investment was required to build the 12 screen theater and plaintiff did not want to run the risk of not receiving this amount in condemnation, it made a business decision to proceed with the 10 screen theater. This decision was plaintiff's decision to make. The fact that Olarsch sent the August 22 letter which set forth the legal position that the Turnpike might take in a condemnation proceedings did not require the plaintiff to accept the Turnpike's statements as binding on it. In its letter of September 16, 1985 plaintiff clearly set forth its position that until the Turnpike "commits itself, officially and legally, to a  binding cause of action " plaintiff was not bound by the Turnpike's actions and proceeded with construction.
In the case at bar, defendants' actions were not wrongful. The defendants did no more than what they were statutorily authorized to do  plan and build a road project. Plaintiff had a choice. Plaintiff could wait for the Turnpike to determine what portion of plaintiff's property, if any, they were going to condemn, or plaintiff could proceed with construction.
The court will grant defendants' motion for summary judgment dismissing Count Two of the second amended complaint.

B. UNJUST ENRICHMENT
Count Three of plaintiff's second amended complaint seeks damages for defendants' unjust enrichment. Plaintiff claims that defendants were unjustly enriched by the hypothetical savings the Turnpike Authority would realize in the future if *478 the Turnpike Authority condemned a portion of plaintiff's property in an unimproved state. The speculative and ambiguous nature of this claim does not warrant a remedy in damages.
Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability. The duty which forms the foundation of a quasi-contractual obligation rests on the equitable principle that a person shall not be allowed to enrich himself at the expense of another. Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 108, 219 A.2d 332 (App.Div. 1966). To recover on a theory of quasi-contract, plaintiff must prove that the defendants were "enriched, ... received a benefit, and that retention of the benefit without payment therefor would be unjust." Id. at 109, 219 A.2d 332.
In the case at bar, the defendants received no benefit from plaintiff. The Turnpike Authority never purchased plaintiff's property, nor did it derive any use or definitive benefit therefrom. Since the defendants received no benefit from the plaintiff or the plaintiff's property, there can be no quasi-contractual liability. This court will therefore grant the defendants' motion for summary judgment dismissing Count Three of plaintiff's second amended complaint.
Assuming, arguendo, that plaintiff could prove a substantive claim of unjust enrichment, plaintiff would still not recover under a theory of quasi-contractual liability. Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law. See generally State v. Singletary, 153 N.J. Super. 505, 380 A.2d 302 (Law Div. 1977) (finding that a court can not exercise equitable jurisdiction when there is an adequate remedy at law). To the extent that the defendants' conduct injured plaintiff, the appropriate legal remedy would be an award of inverse condemnation, not unjust enrichment. A finding that the defendants were unjustly enriched by the Turnpike Authority's decision not to condemn a portion of plaintiff's property would set a dangerous *479 precedent that could adversely affect public finances and exert a chilling effect on public works projects throughout the State.

C. ECONOMIC DURESS
The Fourth Count of plaintiff's second amended complaint seeks damages for wrongful economic duress. Plaintiff alleges that it suffered damages when defendants' actions caused plaintiff to permanently abort its project to build a "state of the art, 12 screen, indoor luxury theatre on the entire Theatre Property."
Although New Jersey courts recognize economic duress as a defense or a basis for contract recision, the courts do not yet recognize economic duress as an affirmative tort action in New Jersey. Even if this court were to expand current New Jersey tort law to include an affirmative cause of action for economic duress, plaintiff has not pled facts sufficient to support a finding of economic duress.
"Merely taking advantage of another's financial difficulty" or "driving a hard bargain" is not duress. Continental Bank of Pa. v. Barclay Riding Acad., 93 N.J. 153, 177, 459 A.2d 1163 (1983). Duress requires "an assent by one party to an improper or wrongful demand by another under circumstances in which the former has little choice but to accede to the demand." Woodside Homes, Inc. v. Town of Morristown, 26 N.J. 529, 544, 141 A.2d 8 (1958).
In the case at bar, defendants' actions were not wrongful. The defendants did no more than what they were statutorily authorized to do  plan and build a road project. As in all cases where it plans a highway project the Turnpike notified property owners of its proposed plans. Each property owner retained the right to proceed as it saw fit. The fact that a property owner may change its plans for the property because *480 of concern as to the final decision by the Turnpike does not constitute redressable duress.
If plaintiff was injured by the defendants' decision not to condemn plaintiff's property, plaintiff's remedy is an action for inverse condemnation, not an action for economic duress. Defendants' motion for summary judgment dismissing Count Four of Plaintiff's second amended complaint will therefore be granted.

D. TORT CLAIMS ACT
Assuming, arguendo, that summary judgment was not granted on the Second, Third and Fourth counts of the second amended complaint, the Tort Claims Act, N.J.S.A. 59:1-1 et seq. would immunize the defendants from liability. The Turnpike Authority is a "public entity" within the meaning of N.J.S.A. 59:1-3. Defendant Olarsch is a "public employee" within the meaning of N.J.S.A. 59:1-3. The Turnpike Authority employed Olarsch as an attorney during the period of controversy in this case. All communications between plaintiff and Olarsch with respect to the proposed taking of plaintiff's property were within the scope of Olarsch's employment. It was Olarsch's responsibility to reconcile the conflicting construction plans of plaintiff and the Turnpike Authority and to communicate that reconciliation to plaintiff.
Insofar as plaintiff fails to allege sufficient facts to support a finding of criminal, fraudulent, malicious or wilful misconduct by defendant Olarsch, the following immunities shield Olarsch from any potential tort liability:
1. Discretionary Acts Immunity, N.J.S.A. 59:3-2 ("A public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him....");
2. Execution or Enforcement of Laws Immunity, N.J.S.A. 59:3-3 ("A public employee is not liable if he acts in good faith in the execution or enforcement of any law....");
3. Misrepresentation Immunity, N.J.S.A. 59:3-10 ("A public employee acting in the scope of his employment is not liable for an injury caused by his representation.");
*481 Since a public entity can not be held liable "for an injury resulting from an act or omission of a public employee where the public employee is not liable," N.J.S.A. 59:2-2(b), neither Olarsch, nor Turnpike Authority could be held accountable for the torts alleged in Counts Two, Three and Four of plaintiff's second amended complaint.
The court has signed the form of order submitted by defendants.