290 N.J. Super. 406 (1996)
675 A.2d 1180
NEW JERSEY TRANSIT PBA LOCAL 304, PLAINTIFF-APPELLANT,
v.
NEW JERSEY TRANSIT CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 2, 1996.
Decided May 21, 1996.
*407 Before MICHELS, VILLANUEVA and KIMMELMAN, JJ.
Stephen B. Hunter argued the cause for appellant (Klausner & Hunter, attorneys; Mr. Hunter, of counsel and on the brief).
Robert A. Shire, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Andrea *408 M. Silkowitz, Assistant Attorney General, of counsel; Mr. Shire and E. Philip Isaac, Deputy Attorney General, on the brief).
Zazzali, Zazzali, Fagella & Nowak, attorneys for amicus curiae New Jersey State Policemen's Benevolent Association (Paul L. Kleinbaum, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
Plaintiff New Jersey Transit PBA Local 304 (PBA or plaintiff) appeals from a summary judgment of the Law Division entered in favor of defendant New Jersey Transit Corporation upholding the constitutionality of the random drug and alcohol testing of its policemen who carry firearms for security purposes and denying its application for an order to show cause to obtain a temporary and permanent restraining order. We affirm.
Plaintiff seeks a reversal of the judgment and a declaration that the random, unannounced testing components of the New Jersey Transit's Drug and Alcohol-Free Workplace Policy regarding its police officers who carry firearms for security purposes is a violation of article I, paragraph 7 of the New Jersey Constitution. Plaintiff also asserts that the trial court failed to properly apply the balancing test traditionally utilized to determine whether such policy violates the New Jersey Constitution.
Defendant New Jersey Transit Corporation (Transit) is a state agency responsible for operating and improving public transportation in New Jersey. N.J.S.A. 27:25-2a, -2b. To further these objectives the New Jersey Legislature empowered Transit to comply with federal rules and regulations, and apply and qualify for, accept and expend financial assistance available under federal law to assure the support and continuance of public transportation. See N.J.S.A. 27:25-5(g). Indeed, the Legislature intended that Transit comply with federal law upon which funding is conditioned so as to be eligible to receive federal funding. See In re NJ *409 Transit Bus Operations, Inc., 125 N.J. 41, 48-49, 592 A.2d 547 (1991).
Plaintiff is the recognized majority representative for all police officers under the rank of captain employed by Transit. Plaintiff represents approximately one hundred and twenty-five police officers, only six of whom, as of April 1995, were assigned to ride on designated Transit trains.
Transit's police department has police and security responsibilities over all Transit locations and services. N.J.S.A. 27:25-15.1a. The officers have general authority within those locations and services to exercise police powers and duties, as provided by law for police officers and law enforcement officers, in all criminal and traffic matters at all times throughout the State of New Jersey. Ibid. They are required to comply with all policies established by the Attorney General, including rules and regulations, directives, advisory opinions, and other guidelines. Ibid. Transit's executive director is authorized to appoint and employ the officers and is required, through Transit's chief of police and in accordance with procedures established by the State Police, to investigate and determine the character, competency, integrity and fitness of all applicants. Ibid. Transit police officers must satisfy the training requirements established by the Police Training Commission. N.J.S.A. 27:25-15.1c. Transit's officers are authorized to carry firearms, N.J.S.A. 2C:39-5, N.J.S.A. 2C:39-6a(7)(a) and N.J.S.A. 27:25-15.1d, provided they satisfactorily complete a firearms training course, N.J.S.A. 27:25-15.1d. They are also authorized to use deadly force. N.J.S.A. 2C:3-7.
In October 1986 the Attorney General of New Jersey (Attorney General) issued guidelines regarding the urine testing of police officers. Attorney General of New Jersey, Law Enforcement Drug Screening Guidelines 2 (Oct. 22, 1986). Based upon the recommendations of the New Jersey Criminal Advisory Council, the Attorney General concluded that "the establishment of uniform statewide drug testing guidelines is absolutely necessary in order to maintain a drug-free law enforcement community and at *410 the same time safeguard the rights of individual police officers." In setting forth specific guidelines, the Attorney General "strongly urged" that (1) law enforcement applicants who will be authorized to carry a firearm be required to submit to urinalysis prior to appointment; and (2) all officers should be subjected to unannounced drug testing by urinalysis during mandatory basic training. Ibid. Additionally, and most pertinent for purposes of this appeal, the guidelines state:
Permanently appointed law enforcement officers should be required to undergo further mandatory drug screening whenever there is individualized reasonable suspicion to believe that the officer is unlawfully using drugs. Officers should be tested under these circumstances only with the approval of the county prosecutor or chief executive officer of the department or his designee.
[Ibid. (emphasis added).]
Thus, in adopting these guidelines, the Attorney General did not specifically authorize the use of random drug testing, but rather required the existence of "individualized reasonable suspicion" of drug use before the testing of a law enforcement employee could be conducted. In revised guidelines which became effective August 1, 1990, the Attorney General addressed the procedural aspects of the drug-testing policy. However, the Attorney General did not change the requirement that there be reasonable suspicion before a drug test could be administered, stating that testing would be conducted based only on facts that provided a reasonable objective suspicion that the officer is illegally using drugs.
In 1991 Congress, in the interest of mass transportation safety, passed the Omnibus Transportation Employee Testing Act (Act) requiring the Secretary of Transportation to issue rules which mandate that mass transit operators receiving federal funds under section 3, 9 or 18 of the Urban Mass Transportation Act of 1964[1] conduct pre-employment, reasonable suspicion, random and post-accident testing for alcohol and drug use in employees responsible *411 for safety-sensitive functions. 49 U.S.C.A. § 5331(b). Failure to test, Congress directed, shall result in ineligibility for federal funding. 49 U.S.C.A. § 5331(g).[2]
On February 15, 1994, the Federal Transit Administration (FTA), among other United States Department of Transportation subagencies, issued final rules implementing the statute. See 49 C.F.R. pts. 653 and 654. Among other mandates, the rules require recipients of federal funds, by January 1, 1995, to implement a program of random alcohol and drug testing of employees who perform the following safety-sensitive functions:
(1) Operating a revenue service vehicle, including when not in revenue service;
(2) Operating a nonrevenue service vehicle, when required to be operated by a holder of a Commercial Driver's License;
(3) Controlling dispatch or movement of a revenue service vehicle;
(4) Maintaining a revenue service vehicle or equipment used in revenue service ...; or
(5) Carrying a firearm for security purposes.
[49 C.F.R. §§ 653.7, 653.13(a), 653.47, 654.7, 654.15(a) and 654.35.]
Pursuant to the federal rules, the random testing must be unannounced, and each time employees are selected for testing, every employee must have an equal chance of being selected. 49 C.F.R. § 653.47(a), (c); 49 C.F.R. § 654.35(f), (g). During the course of each year, at least 50% of the covered employees must be randomly tested for drugs. 49 C.F.R. § 653.47(b)(2). Initially, at least 25% of the covered employees must be randomly tested for alcohol, with the minimum rate subject to adjustment based upon industry results. 49 C.F.R. § 654.35(a) to (d). Procedures for the collection and chain of custody of urine specimens and the identification of the donor are described in 49 C.F.R. part 40.
Significantly, the rules expressly preempt, with the exception of state criminal laws, any state or local law, rule, regulation or order *412 to the extent that compliance with both the state or local requirement and any requirement of the rules is not possible, or where compliance with the state or local requirement is an obstacle to the accomplishment and execution of any part of the rules. 49 C.F.R. §§ 653.9, 654.9. The pertinent subsection of the statute provides:
A State or local government may not prescribe, issue or continue in effect a law, regulation, standard or order that is inconsistent with regulations prescribed under [the statute, except] a State criminal law that imposes sanctions for reckless conduct leading to loss of life, injury or damage to property.
[49 U.S.C.A. § 5331(f)(1).]
Under the terms of the Act, grantees are required to certify their compliance to FTA initially by January 1, 1995, and annually thereafter. 49 C.F.R. §§ 653.83(a), 654.83(a). The Act provides that the failure of a recipient of federal financial assistance for mass transportation to comply with the federal provisions by enacting the required drug-testing policies will result in the recipient's forfeiture of its right to receive federal funds. 49 C.F.R. §§ 653.81(a), 654.81(a). In fiscal year 1995, approximately $324 million of Transit's $1.2 billion total capital and operating budget came from the FTA.
Faced with the prospect of losing federal funding, on December 19, 1994, Transit published a document setting forth a corporatewide policy entitled "Drug And Alcohol-Free Workplace  Core Policy" (Core Policy) that became effective on January 1, 1995, and which provides, in part, as follows:
This document outlines NJ TRANSIT's policy to achieve a drug and alcohol-free workplace. The purpose of this policy is to ensure that NJ TRANSIT operates in the safest and most efficient manner possible and to promote the safety and welfare of our employees and customers by creating a drug and alcohol-free workplace and ensuring that our employees are free from the effects of drugs and alcohol.
... NJ TRANSIT's goal to achieve a drug and alcohol-free workplace shall be accomplished through the implementation of a comprehensive anti-drug and alcohol program based on deterrence, detection, assistance, and enforcement. The program objectives in support of this goal are to prevent drug and alcohol abuse, to assist employees who seek help, to detect drug and alcohol abuse, and to enforce NJ TRANSIT's policy.
*413 Section VII of this document is entitled "Drug and Alcohol Test" and provides the following:
A. As Part Of Voluntary Periodic Medical Examinations (Physicals)

Management Physicals  A management physical is a voluntary periodic physical available to non-agreement employees who meet certain qualifying criteria. All employees who qualify for this examination will be required to sign a form reflecting their consent to drug and alcohol tests.
B. Reasonable Suspicion

This section only applies to employees NOT covered by Addenda I or II.
1. An employee is required to submit to an alcohol and/or drug test when a supervisor has reasonable suspicion, based on specific contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the employee, to believe that the employee has engaged in any of the behaviors prohibited by this policy concerning the use of alcohol and/or drugs.
[Emphasis added.]
Transit's document entitled "Drug and Alcohol-Free Workplace Policy  Addendum I" similarly became effective on January 1, 1995.[3] The articulated purpose of Addendum I is as follows:
This document outlines those requirements of NJ TRANSIT's Drug and Alcohol-Free Workplace Policy which are applicable only to NJ TRANSIT employees who perform safety-sensitive functions as defined herein. As such, this document supplements and is to be read and applied with reference to NJ TRANSIT's Drug and Alcohol-Free Workplace  Core Policy.
Significantly, Addendum I defines covered employee as "a person, including a volunteer, applicant, or transferee, who performs a safety-sensitive function." Addendum I explains that the phrase "performing a safety-sensitive function" includes those periods "in which an employee is actually performing, ready to perform, or immediately available to perform such a function." Section IV of Addendum I provides that all Transit employees, including supervisory personnel, and volunteers who perform safety-sensitive functions are subject to the testing requirements, which are based on the requirements of the FTA. In addition, this section provides that "[e]mployees who perform safety-sensitive functions are required *414 to be tested for drugs and/or alcohol in the following circumstances: pre-employment, reasonable suspicion, post-accident, random, return-to-duty, and follow-up." (Emphasis added.)
Section IX of Addendum I is entitled "Random Unannounced Testing," and provides, in pertinent part:
A. All employees who perform safety-sensitive functions are subject to random, unannounced drug and alcohol testing.
B. Employee numbers shall be in a pool from which random selection is made. Employees shall be selected by a computer-based random number generator that is matched with the employee's employee number. All employees in the random pool shall have an equal chance of being selected for testing and shall remain in the pool even after being tested. Therefore, it is possible for some employees to be tested several times in one year.
C. At various times throughout the year, employees shall be randomly selected for unannounced drug testing. Once the employee has been notified that he has been selected for testing, he must report immediately to the collection site.
On April 26, 1995, plaintiff filed a complaint against Transit with the Superior Court of New Jersey, asserting that those provisions of Transit's drug and alcohol policy that mandate the random testing of law enforcement personnel represented by the PBA constitute an illegal search and seizure and "violates the prescriptions of Article I, Section [sic] 7 of the New Jersey State Constitution." Plaintiff requested, inter alia, the following relief:
(A) Finding that the random testing provision of New Jersey Transit's drug and alcohol policy, insofar as it relates to the random acts of testing of law enforcement personnel represented by PBA Local 304, is unconstitutional in consideration of the prescriptions of Article I, Section [sic] 7 of the New Jersey State Constitution;
(B) Requiring that New Jersey Transit Authority amend its drug and alcohol policy so as to establish that law enforcement personnel represented by PBA Local 304 shall not be subject to any random drug testing;
(C) Voiding the results of any random drug tests conducted of law enforcement personnel represented by Transit PBA Local 304 which would include the reinstatement of any suspended or terminated personnel who were the subject of any random drug tests.
Plaintiff did not challenge those portions of Transit's policy that require drug testing for police officers who undergo annual physical examinations, nor did it question the constitutionality of those portions of the policy that provide for drug testing upon reasonable individualized suspicion.
*415 On May 3, 1995, at a hearing on application by plaintiff for an order to show cause, the Honorable Alvin Weiss considered the federal and state cases addressing the constitutional issues surrounding the administration of drug tests. He concluded:
I think in considering the sensitive nature of law enforcement work and people who carry guns, and in today's society where violence seems to be a common denominator[,] that the defendant in this case has a right to require its police officers who carry guns to take random drug tests to make sure that they are... "Clean." I, therefore, will deny the application for a restraining order by the plaintiff.
On May 23, 1995, Judge Weiss entered a final judgment in which he denied plaintiff's application for an order to show cause and both a temporary and permanent restraining order, thereby rendering the decision a final judgment. In so doing, he
determined that, based upon the evidence submitted, there is no genuine issue as to any material fact in the case, that an evidentiary hearing is therefore unnecessary, and that defendant is entitled to judgment as a matter of law; [a]nd ... that plaintiff's challenge is not federally preempted but that defendant's testing comports with the New Jersey Constitution.

I.
On appeal, plaintiff argues that: (1) there is substantial New Jersey judicial precedent to support its contention that the establishment of random, unannounced testing within Transit's Drug and Alcohol-Free Workplace Policy is unconstitutional in light of the prescriptions of article I, paragraph 7 of the New Jersey Constitution; and (2) the trial court failed to properly apply the balancing test utilized in the past by the Appellate Division in determining whether the random drug testing of transit police officers violated the prescriptions of article I, paragraph 7 of the New Jersey Constitution.
In pertinent part, our State Constitution directs that
[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized. [N.J. Const. art. I, ¶ 7.]
The Fourth Amendment to the United States Constitution is virtually identical to the foregoing provision.
*416 Preliminarily, we note that the Fourth Amendment's prohibition against unreasonable searches and seizures extends to those carried out by public officials. Allen v. County of Passaic, 219 N.J. Super. 352, 358, 530 A.2d 371 (Law Div. 1986) (citing New Jersey v. T.L.O., 469 U.S. 325, 333-34, 105 S.Ct. 733, 739-40, 83 L.Ed.2d 720, 729 (1985)); see also Vernonia School Dist. 47J v. Acton, 515 U.S. ___, ___, 115 S.Ct. 2386, 2390, 132 L.Ed.2d 564, 573-74 (1995).
Furthermore, it has been firmly established by both federal courts and our state courts that "a governmentally compelled taking of urine is both a `search' and a `seizure' within the meaning of the constitutional provisions." Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark, 216 N.J. Super. 461, 466, 524 A.2d 430 (App.Div. 1987); see also National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685, 701 (1989); Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639, 660 (1989); Rawlings v. Police Dept. of Jersey City, 133 N.J. 182, 188, 627 A.2d 602 (1993), O'Keefe v. Passaic Valley Water Comm'n, 132 N.J. 234, 242, 624 A.2d 578 (1993); Caldwell v. New Jersey Dept. of Corrections, 250 N.J. Super. 592, 608, 595 A.2d 1118 (App.Div.), certif. denied, 127 N.J. 555, 606 A.2d 367 (1991); International Fed'n of Professional & Technical Eng'rs, Local 194A v. Burlington County Bridge Comm'n, 240 N.J. Super. 9, 14, 572 A.2d 204 (App.Div.), certif. denied, 122 N.J. 183, 584 A.2d 244 (1990); Allen v. County of Passaic, supra, 219 N.J. Super. at 357, 530 A.2d 371. Consequently, such a test
must meet the reasonableness requirement of the Fourth Amendment, National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685, 701-02 (1989), which "`depends on all the circumstances surrounding the search or seizure [drug test],'" Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639, 661 (1989) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381, 388 (1985)).
[Rawlings v. Police Dept. of Jersey City, supra, 133 N.J. at 188, 627 A.2d 602 (alteration in original).]
*417 Thus, the issue herein is not whether the test set forth in Transit's policy constitutes a search and seizure, but rather whether the test, which is clearly a search and seizure, is unreasonable in light of established constitutional interpretation.
Despite the fact that the search and seizure provisions contained within the New Jersey and United States constitutions are virtually identical, "our state constitution has been found to afford greater protection against unreasonable searches and seizures than may be required by the United States Supreme Court's interpretation of the Fourth Amendment." Fraternal Order of Police, supra, 216 N.J. Super. at 477, 524 A.2d 430; see also State v. Mollica, 114 N.J. 329, 351, 554 A.2d 1315 (1989); State v. Novembrino, 105 N.J. 95, 145, 519 A.2d 820 (1987); State v. Hunt, 91 N.J. 338, 370-72, 450 A.2d 952 (1982); State v. Skidmore, 253 N.J. Super. 227, 232, 601 A.2d 729 (App.Div. 1992); Caldwell v. New Jersey Dept. of Corrections, supra, 250 N.J. Super. at 609, 595 A.2d 1118; International Fed'n of Professional & Technical Eng'rs, Local 194A, supra, 240 N.J. Super. at 16, 572 A.2d 204. Thus, our analysis will begin by addressing the current position of our courts with regard to the constitutionality of random, unannounced drug testing.
To date, New Jersey courts have refused to permit random, unannounced drug testing of employees without the minimal safeguard of a reasonable individualized suspicion that the employee was engaging in drug use. Due to the frequency with which state courts addressing the issue have cited Shoemaker v. Handel, 608 F. Supp. 1151 (D.N.J. 1985), aff'd, 795 F.2d 1136 (3d Cir.), cert. denied, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986), our analysis begins with a discussion of Shoemaker and the cases which have extended its reasoning into the area of law enforcement officers.
In Shoemaker, supra, the plaintiffs, licensed jockeys in New Jersey, had brought an action under 42 U.S.C.A. § 1983, seeking a preliminary injunction to restrain the enforcement of two regulations adopted by the New Jersey Racing Commission which *418 provided for the administration of random breathalyzer and urine tests to licensed jockeys. 608 F. Supp. at 1154. The plaintiffs alleged that these regulations violated the rights guaranteed by the Fourth, Fifth, and Ninth Amendments and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Id. at 1155. In regard to the alleged violations of the Fourth Amendment, the plaintiffs specifically argued that the administration of these drug tests subjected jockeys to unreasonable searches and seizures. Ibid.
In upholding the regulations, the United States District Court for the District of New Jersey began by noting the exception to the warrant requirement that has been carved out for the search of premises in closely regulated industries pursuant to an administrative inspection scheme. Id. at 1155. Although it was clear to the district court that the New Jersey horse-racing industry was closely regulated, the question that was presented was whether the administrative search exception extends to the warrantless testing of not only premises but also persons engaged in the regulated activity. Id. at 1156. The district court concluded that the "plaintiffs fail[ed] to demonstrate that the Racing Commission's breathalyzer testing and urinalysis program is not closely tailored to further the state's legitimate interest in reducing the use of alcoholic beverages and drugs, thereby promoting the safety and integrity of horse racing and protecting the public." Id. at 1157.
In affirming the decision of the district court, the United States Court of Appeals for the Third Circuit noted the existence of two interrelated requirements that justify the warrantless administrative search exception.
First, there must be a strong state interest in conducting an unannounced search. See [Donovan v. Dewey, 452 U.S. 594, 600, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262, 270 (1981)]. Second, the pervasive regulation of the industry must have reduced the justifiable privacy expectation of the subject of the search. Id. Both these requirements are present in the warrantless testing of persons involved in the New Jersey horse racing industry.
[795 F.2d at 1142.]
*419 The Third Circuit reasoned that New Jersey has a strong interest in assuring the public of the integrity of the persons engaged in the horse-racing industry. Id. at 1142.
Subsequently, other courts have displayed a willingness to apply the administrative search exception to police officers by reasoning that police officers represent members of a highly regulated industry. For instance, McDonell v. Hunter, 809 F.2d 1302, 1304 (8th Cir.1987), arose from a class action suit challenging the constitutionality of an Iowa Department of Corrections policy which subjected the correctional institution employees to searches of their vehicles and persons, including urine, blood or breath testing, upon the request of department officials. In regard to urinalyses, the court held that, when properly administered, the testing procedure
is not as intrusive as a strip search or a blood test. While the prison officials have ... [a] legitimate interest in maintaining prison security .. ., the infringement upon the privacy interest of correctional institution employees, already diminished, is lessened. Officials have a legitimate interest in assuring that the activities of those employees who come into daily contact with inmates are not inhibited by drugs or alcohol and are fully capable of performing their duties.
[Id. at 1308.]
In McDonell, the United States Court of Appeals for the Eighth Circuit cited Shoemaker, and held that "[w]e believe the state's interest in safeguarding the security of its correctional institutions is at least as strong as its interest in safeguarding the integrity of, and the public confidence in, the horse racing industry." Id. at 1308. The court thereafter held that "urinalyses are not unreasonable when conducted for the purpose of determining whether corrections employees are using or abusing drugs which would affect their ability to safely perform their work within the prison, `a unique place fraught with serious security dangers.'" Ibid. (citation omitted). Armed with this reasoning, the court concluded that urinalyses may be performed uniformly or by systematic random selection of those employees who have regular daily contact with the prisoners. Ibid.
*420 More recently, in Policemen's Benevolent Ass'n of New Jersey, Local 318 v. Township of Washington, 850 F.2d 133, 134 (3d Cir.1988), cert. denied, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), the defendant township appealed from a summary judgment in favor of the plaintiff which represented a police officer in a suit challenging the defendant's drug-testing policy on Fourth Amendment grounds. The plan implemented by the defendant called for both reasonable suspicion and random testing. Id. at 135. In approving the defendant's plan, the Third Circuit relied upon Shoemaker. Id. at 136. The court cited the numerous statutes and regulations to which the members of the police department are already subject. The court thereafter noted that "[t]hese statutes and regulations speak for themselves. They establish that the police industry is probably the most highly regulated, with respect to performance of its employees, of any industry in New Jersey." Id. at 141; see also Bolden v. Southeastern Pa. Transp. Auth., 953 F.2d 807, 822 (3d Cir.1991), cert. denied, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992); Ford v. Dowd, 931 F.2d 1286 (8th Cir.1991); Penny v. Kennedy, 915 F.2d 1065 (6th Cir.1990); Weicks v. New Orleans Police Dep't, 706 F. Supp. 453, 461 (E.D.La. 1988), aff'd, 868 F.2d 1269 (5th Cir.1989).
Earlier decisions of state courts in New Jersey have refused to allow random drug testing of police officers. See Allen v. County of Passaic, supra, 219 N.J. Super. at 380, 530 A.2d 371, ("The appropriate standard to be applied in situations involving Sheriff's officers and corrections officers is that of reasonable suspicion."). In Fraternal Order of Police, supra, the plaintiffs appealed from a decision of the Law Division which sustained a directive issued by the City of Newark Police Director ordering all members of the Narcotic Bureau to be subjected to urine testing for drug abuse at least twice a year. 216 N.J. Super. at 462, 524 A.2d 430. The directive was issued in response to the Police Director's concern with possible drug abuse among members of the Police Department and also with the public perception of drug abuse among police officers. Id. at 464, 524 A.2d 430. The Director's concern was based on his "`awareness of the extent and seriousness of the *421 problem of drug abuse in society in general, and in Newark in particular, as well as the results of recent urine testing of Police Department recruits'" which had revealed the presence of unlawful substances in several recruits. Ibid. The tests were intended to deter drug use and, thus, advance the interests of public safety and effective law enforcement. Ibid.
In reversing the decision of the Law Division in that case, this court began by noting the principle that
a search or seizure based upon a warrant supported by probable cause is "presumed to be valid" (State v. Valencia, 93 N.J. 126, 133, 459 A.2d 1149 (1983)), and that a warrantless search is "prima facie invalid unless it comes within one of the specific exceptions to the warrant requirement" of the constitutional provisions. State v. Young, 87 N.J. 132, 141, 432 A.2d 874 (1981). See Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).
[Id. at 466-67, 524 A.2d 430 (footnote omitted).]
The defendant, relying upon Shoemaker, supra, had sought to bring the proposed testing within the "pervasively regulated industry" exception to the warrant requirement, which permits certain warrantless searches and seizures without either probable cause or individualized suspicion. Id. at 468, 524 A.2d 430. This court recognized that although administrative searches, i.e., those conducted to enforce a regulatory scheme, are subject to the Fourth Amendment and therefore commonly require the issuance of a warrant, searches of private commercial property utilized in a pervasively regulated industry may be inspected without a warrant and without individualized suspicion. Ibid. Moreover, those "[p]ersons associated with such an industry, may also be subjected to a warrantless search, at least while on the commercial premises." Ibid. (citing In re Martin, 90 N.J. 295, 313-314, 447 A.2d 1290 (1982)).
Nonetheless, this court concluded that police officers are not associated with a highly-regulated industry. Id. at 469, 524 A.2d 430. In so concluding, we reasoned:
Like many other groups of public employees, police officers are subject to a variety of statutory and administrative controls. But government's supervision of its employees cannot be equated with the regulation of sensitive industries requiring "close supervision and inspection." See, e.g., In re Martin, 90 N.J. at 312-313, 447 *422 A.2d 1290. Police are not engaged in a "commercial enterprise" (cf. Donovan, 452 U.S. at 599, 101 S.Ct. at 2538); they are not subject to a "comprehensive and defined" regulatory scheme in which drug testing is a "necessary component" (Id. at 600, 101 S.Ct. at 2538); there has been no legislative determination "that warrantless searches are necessary to further a regulatory scheme[.]" (Ibid.). To treat the police as a "pervasively regulated industry" would dangerously extend and distort that exception to the warrant requirement beyond its intended scope. We thus find ourselves in agreement with the many courts which have found Shoemaker inapplicable to or distinguishable from cases involving public employees.
[Fraternal Order of Police, supra, 216 N.J. Super. at 469, 524 A.2d 430 (alteration in original).]
This court held that because the searches and seizures contemplated by the Police Director's memorandum failed to come within a specific exception to the warrant requirement, the memorandum was prima facie invalid. Id. at 470, 524 A.2d 430. This court concluded that urinalyses conducted without reasonable individualized suspicion were not a proper means to curb drug abuse among, and enhance public confidence in, members of the police department. Id. at 475, 524 A.2d 430. That conclusion was reinforced by referring to the Attorney General's guidelines promulgated in 1986, which, as noted above, similarly require the existence of reasonable suspicion. Id. at 475-76, 524 A.2d 430.
The application of this court's decision in Fraternal Order of Police, supra, would appear to preclude Transit from implementing the proposed drug-testing policy here at issue. Not only do we disagree with its principal holding that police officers are not members of a "highly-regulated industry," 261 N.J. Super. at 469, 619 A.2d 262, we also find outdated the conclusion reached therein that the city directive mandating that all members of the narcotic bureau be subjected to urine testing for drug abuse without probable cause or reasonable individualized suspicion violated the state constitutional prohibition against unreasonable searches and seizures, id. at 478, 619 A.2d 262. We are thoroughly convinced that police officers are members of a "highly-regulated industry." Furthermore, our upholding of the constitutionality of Transit's drug-testing policy is compelled both by the deteriorating conditions *423 of society with respect to drug abuse[4] and subsequent federal decisions.
The two principal United States Supreme Court cases addressing the constitutional implications of drug testing of employees are Skinner v. Railway Labor Executives' Ass'n, supra, 489 U.S. at 606, 109 S.Ct. at 1407, 103 L.Ed.2d at 652-53 and National Treasury Employees Union v. Von Raab, supra, 489 U.S. at 665, 109 S.Ct. at 1390, 103 L.Ed.2d at 701. Notably, both of these cases were decided after this court's decision in Fraternal Order of Police; thus, these cases clearly provide a basis for upholding the constitutionality of Transit's Drug and Alcohol-Free Workplace Policy.
Skinner, supra, arose out of the promulgation by the Federal Railroad Administration (FRA) of regulations which mandated the administration of blood and urine tests to employees who were involved in certain train accidents, as well as to employees who violated certain safety rules. 489 U.S. at 606, 109 S.Ct. at 1407, 103 L.Ed.2d at 652-53. In adopting these regulations, the FRA was responding to evidence which indicated that on-the-job intoxication was a significant problem in the railroad industry. Id. 489 U.S. at 607, 109 S.Ct. at 1407-08, 103 L.Ed.2d at 653. The United States Court of Appeals for the Ninth Circuit invalidated the majority of the regulations, concluding that particularized suspicion was essential to a judicial finding that toxicological testing of railroad employees was reasonable. Id. 489 U.S. at 613, 109 S.Ct. at 1411, 103 L.Ed.2d at 657.
*424 In reversing the judgment of the Ninth Circuit, the United States Supreme Court acknowledged that "chemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee"; indeed, the very process of collecting a urine specimen implicates privacy interests. Id. 489 U.S. at 617, 109 S.Ct. at 1413, 103 L.Ed.2d at 659-60. Thus, the Court concluded, these intrusions must be deemed searches under the Fourth Amendment. Id. 489 U.S. at 617, 109 S.Ct. at 1413, 103 L.Ed.2d at 660.
The Court next undertook an analysis of whether such an intrusion was unreasonable, explaining that in order to determine whether a particular practice is permissible, courts must balance the intrusion of that practice on the individual's Fourth Amendment interests against its promotion of a legitimate governmental interest. Id. 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661. The Court recognized that a search or seizure, except in limited and well-defined circumstances, is not reasonable unless it is conducted in accordance with a judicial warrant issued upon probable cause. Ibid. However, the Court explained that when there exist "special needs" beyond the normal ones for law enforcement which render the warrant and probable-cause requirement impracticable, "we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements in the particular context." Id. 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661.
Armed with these principles, the Supreme Court held that the governmental interest in regulating the conduct of railroad employees to ensure safety presents special needs above and beyond routine law enforcement which potentially justify departures from the usual warrant requirements. Id. 489 U.S. at 620, 109 S.Ct. at 1415, 103 L.Ed.2d at 661-62. The Court likened this governmental interest to the interest implicated by the supervision of regulated industries and prisoners on probation, and the operation of government offices, schools, and prisons. Ibid.
*425 The Court reasoned that the employees covered by the FRA regulations include persons engaged in safety-sensitive jobs. Id. 489 U.S. at 620, 109 S.Ct. at 1415, 103 L.Ed.2d at 662. The Court noted that the reason the FRA prescribed toxicological tests was not to assist in the prosecution of employees but rather to prevent accidents caused by the impaired performance of employees under the influence of alcohol or drugs. Id. 489 U.S. at 620-21, 109 S.Ct. at 1415, 103 L.Ed.2d at 662 (citing 49 CFR § 219.1(a) (1987)). The need to ensure the safety of both the traveling public and the employees themselves clearly justifies regulations prohibiting covered employees from engaging in alcohol or drug use while on duty or even while subject to being called for duty. Id. 489 U.S. at 621, 109 S.Ct. at 1415, 103 L.Ed.2d at 662.
The Court then explained that the remaining consideration is whether the Government's need to monitor compliance with these restrictions justifies the privacy intrusions at issue in the absence of a warrant or individualized suspicion. Id. 489 U.S. at 621-22, 109 S.Ct. at 1415, 103 L.Ed.2d at 662-63. The Court declared that the "Government's interest in dispensing with the warrant requirement is at its strongest when, as here, `the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.'" Id. 489 U.S. at 623, 109 S.Ct. at 1416, 103 L.Ed.2d at 663 (quoting Camara v. Municipal Court of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).
The Court recognized that even a search that may be performed without a warrant must be based, as a general matter, on probable cause to believe that the person to be searched violated the law. Even when the balance of interests militates against a showing of probable cause, the Court has usually required a measure of individualized suspicion before upholding the reasonableness of a search. Id. 489 U.S. at 624, 109 S.Ct. at 1417, 103 L.Ed.2d at 664. However, the Court went on to explain that "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of *426 individualized suspicion, a search may be reasonable despite the absence of such suspicion." Id. 489 U.S. at 624, 109 S.Ct. at 1417, 103 L.Ed.2d at 664.
The Court stated that the intrusions occasioned by blood tests and breath tests were not significant. Id. 489 U.S. at 625-26, 109 S.Ct. at 1418, 103 L.Ed.2d at 665. The Court admitted that urine tests presented a more difficult question since the procedures for collecting the necessary specimens, unlike the procedures utilized for breath or blood tests, require employees to perform an excretory function usually shielded by great privacy. Id. 489 U.S. at 626, 109 S.Ct. at 1418, 103 L.Ed.2d at 666. However, the Court was satisfied that these concerns had been mitigated by the promulgation of regulations tailored to reduce the intrusiveness of the collection process. Ibid.
Significantly, the Court found that covered employees had diminished expectations of privacy by virtue of their participation in an industry that is highly regulated to ensure safety, a goal which depends, in large part, on the health and fitness of covered employees. Ibid. Moreover, where covered employees are engaged in tasks so fraught with enormous risks of injury to others that even a momentary lapse in concentration can have disastrous results, the Government interest in testing without a showing of individualized suspicion becomes quite compelling. Id. 489 U.S. at 628, 109 S.Ct. at 1419, 103 L.Ed.2d at 667.
The Court reasoned:
Much like persons who have routine access to dangerous nuclear power facilities, see, e.g., Rushton v. Nebraska Public Power Dist. 844 F.2d 562, 566 (C.A.8 1988); Alverado v. Washington Public Power Supply System, 111 Wash.2d 424, 436, 759 P.2d 427, 433-434 (1988), cert pending, No. 88-645, employees who are subject to testing under the FRA regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others.
[Id. 489 U.S. at 628, 109 S.Ct. at 1419, 103 L.Ed.2d at 667.]
Under such circumstances a requirement of particularized suspicion of drug and alcohol use would create serious impediments to an employer's ability to identify impaired employees or to obtain information about the causes of major accidents. Id. 489 U.S. at *427 631, 109 S.Ct. at 1420, 103 L.Ed.2d at 668. Thus, since the compelling Government interests served by the FRA's regulations would be significantly hampered by requiring railroads to indicate specific facts giving rise to a reasonable suspicion of impairment before testing a covered employee, the Court in Skinner abandoned the reasonable suspicion standard under the facts there at issue. Id. 489 U.S. at 633, 109 S.Ct. at 1421-22, 103 L.Ed.2d at 670.
In National Treasury Employees Union v. Von Raab, supra, a case decided by the United States Supreme Court on the same day as Skinner, the Commissioner of the United States Customs Service, following the report of a Drug Screening Task Force which concluded that urinalyses provided a technologically reliable, valid and accurate method of drug screening, had announced his intention to require drug tests of employees who applied for or occupied certain positions within the service. 489 U.S. at 660, 109 S.Ct. at 1384, 103 L.Ed.2d at 698. Drug tests were made a condition of placement or employment for positions that met one or more of three criteria, which included carrying firearms. Id. 489 U.S. at 660-61, 109 S.Ct. at 1388, 103 L.Ed.2d at 699. The Court affirmed so much of the judgment of the United States Court of Appeals for the Fifth Circuit as upheld the testing of those employees directly involved in drug interdiction or who were required to carry firearms. However, the Court vacated the judgment to the extent it upheld the testing of applicants for positions requiring the incumbent to handle classified materials. Id. 489 U.S. at 664-65, 109 S.Ct. at 1390, 103 L.Ed.2d at 701.
In reaching its decision in Von Raab, the Court reaffirmed the principle that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Id. 489 U.S. at 665, 109 S.Ct. at 1390, 103 L.Ed.2d at 702. The Court reiterated that Fourth Amendment intrusions where they serve special governmental needs beyond those for law enforcement necessitate a balancing of the individual's privacy expectations against the Government's *428 interests to determine whether the requirement for a warrant or some level of individualized suspicion is impractical in the particular circumstance. Id. 489 U.S. at 665-666, 109 S.Ct. at 1391, 103 L.Ed.2d at 702.
The Court acknowledged that "[e]ven where it is reasonable to dispense with the warrant requirement in the particular circumstances, a search ordinarily must be based on probable cause." Id. 489 U.S. at 667, 109 S.Ct. at 1392, 103 L.Ed.2d at 703. The Court pointed out that "the probable-cause standard `is peculiarly related to criminal investigations.'" Id. 489 U.S. at 667, 109 S.Ct. at 1392, 103 L.Ed.2d at 703. (citation omitted).
The Court recognized "that the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." Id. 489 U.S. at 670, 109 S.Ct. at 1393, 103 L.Ed.2d at 705. Moreover, the Court declared that
[t]he public interest likewise demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm, even if the incumbent is not engaged directly in the interdiction of drugs. Customs employees who may use deadly force plainly "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Railway Labor Executives, ante, at 628, 109 S.Ct. at 1419, 103 L.Ed.2d at 667.
[National Treasury Employees Union, supra, 489 U.S. at 670, 109 S.Ct. at 1393, 103 L.Ed.2d at 705.]
Thus, in both Skinner and Von Raab, the Court held that individualized reasonable suspicion was not an indispensable prerequisite for a public employer to conduct drug tests of its employees.
The question that remains, therefore, is whether, in light of the United States Supreme Court's decisions in these two cases, New Jersey courts should re-evaluate their assessment of the constitutional implications of random drug testing of police officers who perform safety-sensitive functions.
In International Federation of Professional & Technical Engineers, Local 194A, supra, we held that the drug testing of public employees physically involved in the opening and closing of *429 bridges which cross the Delaware River may be conducted as part of an annual physical examination. This court's holding was based on scrutiny of the totality of circumstances, including the nature of the employees' work, and the non-random nature of the test, i.e., the test was to be administered during the employee's annual physical examination. 240 N.J. Super. at 11, 572 A.2d 204.
In reaching our conclusion, we distinguished the tests involved in Fraternal Order of Police, supra, and Allen v. County of Passaic, supra, explaining that in those two cases the tests were to be conducted at random, whereas the tests then before us were part of a routine annual physical examination. Id. at 17, 572 A.2d 204. We further explained that a scheduled test is less objectionable than a random test since employees have a reduced expectation of privacy as to the former, which thus renders the testing only minimally intrusive. Id. at 17, 572 A.2d 204. A much greater privacy interest is involved in a random testing situation. Id. at 24-25, 572 A.2d 204.
We also recognized that as a result of Skinner and Von Raab, nothing in federal constitutional law prevents requiring public employees whose duties implicate the safety of the public to undergo a urinalysis, particularly during an annual or regularly scheduled physical exam, even absent a reasonable suspicion that the tested individuals were drug users. Id. at 22, 572 A.2d 204. We added: "[T]he drug testing must serve some `special needs' of the employing governmental body, rather than being designed to gather evidence for a criminal prosecution. Even if the `special need' appears, the individual's privacy interest must be balanced against the public employer's interest." Id. at 22, 572 A.2d 204.
Thus, in International Federation of Professional & Technical Engineers, Local 194A, we distinguished random testing from other drug testing procedures. However, while we continued to endorse the view that random drug testing imposed greater constitutional concerns, we acknowledged that
[i]n cases where the public safety depends on the fitness of employees, courts have recently upheld even random drug tests. See, e.g., Harmon v. Thornburgh, [878 *430 F.2d 484 (D.C. Cir.1989), cert. denied sub nom. Bell v. Thornburgh, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990)]; Rushton v. Nebraska Public Power Dist., 653 F. Supp. 1510 (D.Neb. 1987) aff'd 844 F.2d 562, 566-567 (8 Cir.1988) (upholding random [drug] testing of nuclear power plant workers, given the great potential for danger and resulting lowered expectation of privacy).
It appears insignificant that the initial May, 1986 drug screen may be deemed "random." The governing "balancing test" now appears to be the same for "random" as well as post-accident (Skinner) or "pre-ascension" (Von Raab) type drug testing.
[International Federation of Professional & Technical Engineers, Local 194A, supra, 240 N.J. Super. at 23, 572 A.2d 204.]
In Hennessey v. Coastal Eagle Point Oil Co., 247 N.J. Super. 297, 306, 589 A.2d 170 (App.Div. 1991), aff'd, 129 N.J. 81, 609 A.2d 11 (1992), a case involving an employee of a private oil company who was discharged following a positive drug test, we observed that the vitality of our decision in Fraternal Order of Police, supra, despite its reliance on the New Jersey Constitution, was diluted by Skinner and Von Raab. In affirming our decision in Hennessey, supra, the New Jersey Supreme Court took note of the United States Supreme Court cases decided after Fraternal Order of Police, 129 N.J. at 105, 609 A.2d 11. The Court stated that "[w]e agree that the combination of the impracticality of less-intrusive means of detecting drug use and the urgent need to ensure public safety renders urine testing a permissible method of preventing drug use among employees in safety-sensitive jobs." Id. at 106, 609 A.2d 11. However, the Court emphasized the continued need to protect employee privacy and thus urged employers to formulate and implement procedures designed to minimize the intrusiveness of the testing process. Ibid. The Court concluded that "[b]ecause the safety-sensitive nature of [the plaintiff's] employment raises the potential for enormous public injury, the public policy supporting safety outweighs any public policy supporting individual privacy rights." Id. at 107, 609 A.2d 11.
Nonetheless, while Hennessey provides some useful language, it did not specifically involve the issue of the drug testing of police officers. In Rawlings v. Police Dept. of Jersey City, supra, 133 N.J. 182, 627 A.2d 602, the Court was asked to consider whether the defendant violated the Fourth and Fifth Amendment rights of *431 the plaintiff, a police officer, by directing him to submit a urine sample for mandatory testing pursuant to a departmental order that required officers to submit to testing on individualized reasonable suspicion that the officer had unlawfully used drugs. Id. at 185, 627 A.2d 602. The plaintiff refused to obey the order following his arrest on suspicion of possessing and distributing cocaine. Id. at 185-86, 627 A.2d 602. The Court held that the challenged order was designed to prevent unlawful drug use by police officers and served special governmental needs. Id. at 189, 627 A.2d 602. Thus, our Supreme Court recognized the fact that the dangerous nature of a police officer's position requires special consideration in assessing the constitutionality of a drug-testing program. The Court believed that particularized suspicion effectively balanced the Fourth Amendment rights of the police officer and the interests of the department in conducting a drug test. Id. at 191, 627 A.2d 602. Because the order explicitly required the existence of individualized reasonable suspicion, the Court did not need to reach the issue of whether drug-testing without individualized suspicion would contravene plaintiff's Fourth Amendment protections. Id. at 190, 627 A.2d 602. However, the Court did note that the United States Supreme Court in Von Raab and Skinner had relaxed the Fourth Amendment protection sufficiently to obviate the requirement for individualized suspicion. Id. at 190, 627 A.2d 602.
In O'Keefe v. Passaic Valley Water Commission, supra, 132 N.J. 234, 624 A.2d 578, the plaintiff challenged a written policy implemented by the defendant which required all applicants for employment to submit to a drug test and afforded the defendant the right to refuse to hire any person who refused to submit to such a test. The plaintiff asserted that the defendant refused to hire him as a water-meter reader because he would not take the test. He argued that the defendant's policy violated both the Fourth Amendment of the United States Constitution and article I, paragraph 7 of the New Jersey Constitution. Id. at 236, 624 A.2d 578.
*432 Although the New Jersey Supreme Court concluded that the issue of the constitutionality of the program was rendered moot, it nevertheless took the opportunity to address the problems that plague employment-related drug-testing cases. Id. at 242, 624 A.2d 578. In so doing, the Court, again citing the United States Supreme Court decisions of Skinner and Von Raab, set forth a framework within which to analyze the constitutionality of drug-testing programs that is useful to the present analysis. The Court stated that "[a]fter determining whether a special need exists, a court must then balance the applicant's or employee's privacy interests against those of the government employer in administering the drug-testing program." Id. at 243, 624 A.2d 578. Thus, our Supreme Court advocates the balancing test endorsed by the United States Supreme Court in Skinner and Von Raab.
In applying such a balancing test herein, the government's need to conduct random, suspicionless searches outweighs the privacy interests of the covered employees  here, employees who carry a firearm for security purposes  to such a degree that it is impractical to require either a warrant or a measure of individualized suspicion. See Von Raab, supra, 489 U.S. at 665-66, 109 S.Ct. at 1391, 103 L.Ed.2d at 702. In this case, the special governmental need of protecting the public from the risk posed by officers who are impaired by drugs or alcohol cannot be ignored.
Moreover, the regulations promulgated by Transit endeavor to minimize the intrusiveness of the urine collection process. See Skinner, supra, 489 U.S. at 626-27, 109 S.Ct. at 1418, 103 L.Ed.2d at 666. Furthermore, our Supreme Court has acknowledged that a police officer has a diminished expectation of privacy due to the nature of his employment. Rawlings v. Police Dep't of Jersey City, supra, 133 N.J. at 189-90, 627 A.2d 602.
We recently had the opportunity to address the Skinner/Von Raab balancing test in upholding the constitutionality of two statutes, N.J.S.A. 2A:4A-43.1 and N.J.S.A. 2C:43-2.2. Those statutes require serological testing for AIDS and HIV of defendants charged with certain sexual offenses upon request of the victim. *433 See State in Interest of J.G., N.S. and J.T., 289 N.J. Super. 575, 674 A.2d 625 (App.Div. 1996). In our decision we acknowledged the devastating impact a report of infection may have on a defendant, id. 289 N.J. Super. at 589-90, 674 A.2d 625, but found that, applying the Skinner/Von Raab balancing test, the individual defendant's interest in preventing a bodily intrusion and disclosure of his or her HIV status is significantly less weighty than the compelling state interest in the health and welfare of the victim in particular and the public in general, id. 289 N.J. Super. at 592, 674 A.2d 625.
The employees here involved, by virtue of the risks inherent in their jobs and the split-second decisions they are required to make, have the potential "to cause great human loss before any signs of impairment become noticeable to supervisors or others." See Skinner, supra, 489 U.S. at 628, 109 S.Ct. at 1419, 103 L.Ed.2d at 667. The regulations which are the subject of this appeal apply only to Transit police officers who carry firearms; therefore, those regulations are minimally intrusive. Based upon a balancing test, this glaring potential for harm, when considered against the backdrop of the other factors noted above, supports the constitutionality of Transit's drug-testing policy.

II.
We need not determine whether the judgment of the trial court could be sustained based upon the United States Constitution, Article I, Section 8, Clause 3 (the Commerce Clause) or Article VI, Clause 2 (the Supremacy Clause).
Affirmed.
NOTES
[1] Later in 1991, the Urban Mass Transportation Act was amended and its name changed to the Federal Transit Act. Pub.L. 102-240, § 3003(b).
[2] In pertinent part, 49 U.S.C.A. § 5331(g) states that "[a] person is not eligible for financial assistance under section 5307, 5309 or 5311 of this title or section 103(e)(4) of title 23 if the person is required, under regulations the Secretary of Transportation prescribes under this section, to establish a program of alcohol and controlled substances testing and does not establish the program."
[3] Addendum II delineates those requirements of Transit's Core Policy which are applicable only to Transit employees who perform Rail covered service. Under the terms of Addendum II, all such employees "are subject to random, unannounced drug and alcohol testing."
[4] Judge Weiss, in upholding the constitutionality of Transit's Drug and Alcohol-Free Workplace Policy, noted a recent incident in the Essex County Courts Building where a police officer who was about to testify in a drug-related case was assassinated outside of the courtroom. Later it became common knowledge that an autopsy of the police officer disclosed that that officer was taking drugs. Judge Weiss also noted that the New York Times has recently reported major investigations in various precincts in New York because of drug use by police officers.